[No. 14533. Department Two. April 27, 1918.]

VERNA ROCKWELL, *Respondent,* v. J. W. DAY,
*Appellant.*[1]

SEDUCTION—PROMISE OF MARRIAGE—NECESSITY. Where seduction
is alleged under promise of marriage, or the promise is required by
statute, it must be shown that the necessary promise existed at the
time of the seduction.

SAME—PROMISE OF MARRIAGE—EVIDENCE—SUFFICIENCY. A promise
to "take care" of a woman of mature years who has voluntarily
submitted herself to sexual intercourse, and who has been married
and knows what it means to be "taken care of" after illicit cohabita-
tion, is not a sufficient promise of marriage to sustain an action
for seduction, especially where there was no impediment to mar-
riage, the parties lived together openly and consent was not ob-
tained by promises which made the struggle unequal when meas-
ured by age, experience, and other attending circumstances.

SEDUCTION—CIVIL ACTION — ACCRUAL—LIMITATIONS — CONTINUING
RELATIONS—ABANDONMENT. A right of action for seduction under
promise of marriage accrues at the time the promise is made; and
granting that it would continue until the illicit relations are broken
off and three years thereafter, such relations must be continuous,
and if abandoned and returned to under no new promise, the stat-
ute began to run at that time, and the action must be brought with-
in three years after such an abandonment.

Appeal from a judgment of the superior court for
Spokane county, Mitchell, J., entered July 5, 1917,
upon the verdict of a jury rendered in favor of the
plaintiff, in an action for seduction. Reversed.

*Voorhees & Canfield,* for appellant.

*C. E. Ellis* and *Chas. W. Gillespie,* for respondent.

CHADWICK, J.—Plaintiff brought this action to re-
cover damages for seduction. The jury returned a
verdict in her favor, and the defendant has appealed.
The assignments of error principally relied on are that
the action is barred by the statute of limitations and

[1]Reported in 172 Pac. 754.

that the facts are not sufficient to sustain the verdict and judgment. These questions were preserved throughout the trial by appropriate pleadings and motions. Plaintiff alleges that the seduction occurred on or about the 9th day of April, 1909, and that the meretricious relations then begun continued until on or about the 20th day of December, 1913. This action was begun on the 5th day of December, 1916. It is the contention of defendant that the statute began to run on the 9th day of April, 1909, and that an action would be barred on the 9th day of April, 1912. He cites Rem. Code, § 159, which makes no exemption in favor of this class of actions, and the following cases: *Wilhoit v. Hancock,* 5 Bush (68 Ky.) 567; *Dunlap v. Linton,* 144 Pa. St. 335, 22 Atl. 819; *Davis v. Boyet,* 120 Ga. 649, 48 S. E. 185, 102 Am. St. 118, 66 L. R. A. 258.

See, also, *People v. Nelson,* 153 N. Y. 90, 46 N. E. 1040, 60 Am. St. 592; *People v. Clark,* 33 Mich. 112.

Plaintiff insists that the better rule is that the statute does not begin to run, where improper relations are begun under a promise of marriage, so long as the relations are continued, or until the last act of intercourse, that all the acts of intercourse are one transaction and that a continued promise of marriage is implied from time to time. She relies on *Davis v. Young,* 90 Tenn. 303, 16 S. W. 473, and on *Ferguson v. Moore,* 98 Tenn. 342, 39 S. W. 341; *Gunder v. Tibbits,* 153 Ind. 591, 55 N. E. 762; *Breiner v. Nugent,* 136 Iowa 322, 111 N. W. 446; *Baird v. Boehner,* 77 Iowa 622, 42 N. W. 454; *People v. Millspaugh,* 11 Mich. 278. The general rule, as most text writers agree, is that the statute begins to run from the time of the seduction, where the action is maintained by the woman on her own behalf. Wood, Limitations (2d ed.), § 186; Burdick, Law of Torts, § 273; 35 Cyc. 1308, and 25 Am. & Eng. Ency. Law (2d ed.), p. 224. But whether we call

the one or the other the general or the better rule, it must be admitted that there is a very marked conflict of authority. We could base our opinion on either rule and sustain it by sound reason, for if the one rule protects the artless and confiding female, the other protects the man from the artful pretensions of women who may pretend to have been seduced in order to obtain a pecuniary compensation or to hide a shame revealed by a subsequent pregnancy, and who may fortify their pretensions by a showing of continued illicit cohabitation as a circumstance to sustain the charge of seduction under a promise of marriage or by arts, persuasions or promises.

There is an equity in cases of this character, it is noted by Mr. Cooley in *Watson v. Watson,* 53 Mich. 168, 18 N. W. 605, 51 Am. Rep. 111. In many of the cases it is confessed without notice. This court in the case of *State v. Carter,* 8 Wash. 272, 36 Pac. 29, upheld a seemingly improbable and untruthful statement of her case by the prosecutrix because of her "tender age." But if there be no equity, a case of seduction brought by a woman of mature years calls for cautious inquiry, holding fast to the law's first aid, common sense.

The facts in many of the cases seem to have called for a rule that would allow or defeat the action according to the justice of the particular case. Our thought may be illustrated by reference to *Franklin v. McCorkle,* 16 Lea (84 Tenn.) 609, opinion on rehearing, later overruled in *Davis v. Young,* 90 Tenn. 303, 16 S. W. 473. In the one case, the justice of the case was with the defendant; in the other, the justice of the case was with the plaintiff. It was so in the state of Indiana, where, in an earlier case, the court held that the statute began to run from the first act of seduction. In a later case, where it was clear that the woman had

been made the victim of the man, the rule was held otherwise. *Gunder v. Tibbits, supra.*

We therefore, at this time, hesitate to lay down any rule that would be a guide for all cases,, nor is it necessary as we view the facts in this case.

Plaintiff alleges in her complaint, and counsel sought diligently to prove at the trial, that she had been seduced under a promise of marriage and that the relations of the parties had been continued under that promise. We have studied the facts diligently and are convinced that, if the case cannot be sustained upon a promise of marriage, it cannot be sustained at all, for the "solicitation, persuasion and promises" of defendant do not, considering the age of the plaintiff and her understanding, make out a case of seduction. Moreover the rule is:

"Where the seduction is alleged to have been committed under a promise of marriage, or where such a promise is required by statute, it must be shown that the necessary promise existed at the time of the seduction, etc." 25 Am. & Eng. Ency. Law (2d ed.), 239.

Plaintiff was 49 or 50 years of age at the time of the trial, 1917. She says the seduction occurred in April, 1909, so her age then was about 42. She was married in the year 1885, her husband died in 1907. She has two grown daughters, one of the age of nearly thirty years, and the other eighteen months younger. Plaintiff knew defendant before her husband died. They came together thereafter in a business or social way. Their association gradually grew more friendly and their relations more intimate. Defendant called frequently at plaintiff's rooms at the several hotels and lodging houses in which she resided. In the fall of 1908, she became ill and went to a hospital. Defendant called on her there; he paid her bill, and finally, at her request, removed her to the home of her niece. From

the first early days of the friendship and association
of these people, defendant constantly and persistently
importuned plaintiff to submit to sexual intercourse.
According to the story of the plaintiff, and we are fol-
lowing her testimony as closely as we can, he let no
opportunity pass when they were alone to "love her
up in most every way a man can a woman"; to kiss,
caress, fondle and pet her, and at least on one occasion,
as she says, he tried every way he could to "get his
hand up under my clothes." The positions of the par-
ties in this battle were so clearly defined, and if plain-
tiff was possessed of the understanding of the ordinary
human being and the natural modesty of womankind,
she must have understood that defendant had no hon-
orable intention or high-minded purpose to love and
cherish her. He was resolute in his purpose to con-
jugate with her, and she was willing to be fondled,
caressed and "loved up" by a man who brought no
appeal other than to the brutish instincts of the object
of his lascivious desire. Knowing this situation, the
attitude of defendant, and the possible consequence of
further association, plaintiff, after some slight dis-
agreement with her niece, and at the suggestion of
defendant, went to work for him in his office. Defend-
ant secured a room for her in a hotel or rooming house
known as the Minnesota block. She stayed in the office
during the day; defendant was a frequent caller by
night. Their association was constant, and defendant
was insistent when they were alone. He was always
fondling and caressing her. The inference from her
testimony is that defendant's sexual desire was the
outstanding topic of conversation. There was no for-
mal promise of marriage or artful persuasion that a
woman over forty years of age and the mother of
grown children could urge as a seductive influence.

She had exacted no promise of marriage, and defend-
ant had made none. Her story is:

"He would come to the office every few minutes or
every short time from the shop and come in there and
he would make love to me and caress me in every way
that a man could to a woman to show his affection for
her; and he said he cared more for me than any woman
he had ever met. He kissed me there in the office many
a time and he has made reference to sexual intercourse
there. He used to try to get me—he had his room in
the back part of the office and he used to try to get me
to go in there in his room and his bed with him. That
occurred very many times, and at those times he prom-
ised me that he would care for me and we would be
friends, and after a while when we got better ac-
quainted, he says—that was the beginning of our ac-
quaintance, the first year—he said, 'after we get better
acquainted' and so on, he says 'we·will have a happy
home.'"

Plaintiff went to Seattle just before Christmas, 1908.
At that time the virtue of plaintiff was triumphant,
the vice of defendant had been baffled. Plaintiff re-
turned to Spokane about the 20th of January. She
took a room at a hotel; the next day she telephoned de-
fendant. She threw out a skirmish line. Defendant
chided her because she had not called him as soon as
she had arrived, saying:

"I suppose you had some other man at your room
Saturday night and you didn't want me to know you
were there."

Plaintiff was not repelled by this burning insult to
chastity. The next day she went to defendant's office.
He caressed her, drew her down upon his lap, and said
"You are in trouble and have got to tell me what it
is." She then told defendant she was in trouble con-
cerning a piece of property. Defendant procured coun-
sel for her; she went to his office right along, because,
as she says, he was assisting her in the litigation over

her property. During this time the enemy was busy. The drive was on.

"He made advances in regard to sexual intercourse. He always tried to get me to submit to him from the beginning. I don't know as anything occurred in relation to his promises to marry me."

Plaintiff describes the persuasions and promises made before she went to his office to work.

"He was very affectionate. When sick, he showed great affection and sympathy. He treated me kindly. I can remember more what he done than what he said. He made love to me. He caressed me. He sat down on the bed and loved me up. I don't know that I can particularly state the words that he said. He kissed, he petted me. He made love to me every way he could that night and tried to persuade me to lay down on the lounge with him there."

"Q. And did he state anything about marriage? (Objected to as leading.) Q. Well, just state what was said then. A. He said that if I would submit to him he would care for me, and that I was not able to work. I was sick and I didn't have the means to take care of myself and he would see that I was taken care of and he would do all he possibly could for me."

After going to the office:

"He made love to me and caressed me in every way that a man could to a woman. He said he cared for me more than any woman he ever met. He kissed me. He tried to get me . . . to go into his room and bed with him. . . . Q. Make any promises? A. Well, yes, he promised me that he would care for me and we would be friends, and after while when we got better acquainted, he says—that was the beginning of our acquaintance, the first year—he said 'after we get better acquainted' and so on, he says 'we will have a happy home.' He called me affectionate names. Q. Did he make any promises at that time in regard to marriage? (Objected to.) Q. Just state what, if anything, occurred in that respect? A. Well, I don't know

as anything particular occurred in any way only that
we were together out there most of the time.''

Plaintiff says she submitted her person to the em-
brace of defendant on the 9th day of April. Her ver-
sion of her final capitulation is quoted from the un-
challenged abstract of her testimony.

"The way that occurred is this: He was at my room
every evening, we were together every evening mostly,
and he came up one evening and he asked me if I would
get supper for him, if he would go down and get some—
I believe it was oysters and crackers that he asked me
to cook that night—we would eat supper together that
night, and I said I would. So we were together that
evening until some time late, and the next evening he
was up there again, the second evening he was up there
again. And I don't remember right now whether we
ate our dinner together that evening or not; but the
third evening that he was up there he came up there
and we had dinner and then after that why, he read the
paper while I was washing the dishes, doing my work;
and after that we spent the evening visiting together
in the usual way that most anyone would, until it be-
gan to get late he kept insisting on that he was not
going home, he was going to go to bed; I told him the
best thing he could do was to get back to the office; I
told him my character was all that I had left—after
that was gone I had nothing left. He stayed there and
coaxed and promised that I was not able to work, that
he would take care of me and we would have a home,
that I would have plenty if I would take care of him,
that I wouldn't have to work. He said that he would
care for me, he would see that I would have a home, I
wouldn't have to work as my financial affairs were
limited at that time, my health was poor. He stayed
there, I guess it must have been about eleven o'clock
or so, he finally promised that he would never throw
me down; he said if I would submit to him he would
stay with me through thick and thin; he said he would
never throw me down, he would throw down all the
rest of the women he was going with, which he said was
five right now, that he was going with at that time, he

said he would stay by me. (St. p. 22.) I suppose my conduct towards him must have been very affectionate. There was discussion about marriage at that time. The subject of marriage had not come up very frequently, but it did later on. About the 9th day of April I submitted to sexual intercourse with him. I don't know that the subject of marriage was discussed between me and Mr. Day right after this certain time, but later on—it was very soon afterwards. We discussed marrying before we had sexual intercourse the first time, the first evening he came up there during this, the third evening that we had the intercourse. Then he made me promises that he would care for me, as I have explained before, and he says 'If you will submit to me' he says 'we will never aim to part.' 'Well' I says, now, as I explained my character was all I had; he said 'That will not hurt your character with anybody. I will take you and take care of you and protect you.' I met him every evening after that because he was at my room. After that one certain evening, why, they was most all the time that we had intercourse together a good deal of the time after that. His demeanor towards me was just as affectionate as any man could be. He did kiss me. (St. p. 23.) I met him often after we had this intercourse. We lived together.''

A promise to ''take care'' of a woman, made under some circumstances, might be tortured into a promise of marriage, but a woman of mature years who has voluntarily submitted herself to unrighteous solicitation for several months, and who knows what marriage is, and what a promise of marriage is, and the possible consequences of illicit cohabitation, and what it means to be ''taken care of'' after illicit cohabitation, who comes relying upon such a promise, should be held to proof more positive than mere inference.

On the 10th day of April, 1909, the defendant moved into the rooms of plaintiff and the parties immediately set up housekeeping. After a time they moved to the Kansas House, and then back to the Minnesota House,

afterwards the parties went to live in a house owned and maintained by defendant on Mallon avenue, and thereafter lived at a place owned by plaintiff at Ross Park, and thereafter at a place out on College street, and again at the Mallon Avenue house. They so far maintained the ordinary domestic routine that they sometimes quarreled, and finally their relations were entirely broken off. When this occurred plaintiff was pregnant.

While a formal promise of marriage is not an essential fact to be proved under the laws of this state to sustain a charge of seduction, the lack of such a promise, when considered in the light of all the testimony, may be a strong and even controlling circumstance in a civil action for damages. For eight months prior to the alleged seduction plaintiff knew of the attitude and purpose of defendant, and if marriage was talked about, as she says it was, it was not suggested in a way that would overcome the natural modesty and virtuous instincts of a woman of chaste character. She does not anywhere say that she invited defendant to fulfill the promise prior to the time of the seduction, or at all.

"It is a little remarkable, if the girl relied upon a promise of marriage, that after she found herself pregnant she should never have demanded or even asked marriage." *People v. Millspaugh*, 11 Mich. 278, 283.

There was no impediment to marriage, either physical, moral or legal; a license could have been obtained and the ceremony performed at any time during the months between August, 1908, and April, 1909, or within any time during the four years and nine months following. The auditor's office was only a few blocks distant and there were parsons in plenty. Plaintiff knew the law and could have protected her chastity by the very simple expedient of making the surrender of her favors legal. This is not a case of a young woman suf-

fering under an impediment of minority or the non-consent of parents, nor is it one where the woman has been carried away by the torrential flow of the hot blood of youth. The undoing of plaintiff, by her own account, as we have seen, was deliberate and formal. This was no secret liaison. The lives of the two ran on in contentment. They lived together openly. Defendant provided the home and fed and clothed plaintiff and she performed the usual duties of the housewife. They were affectionate one with the other. The world will ask, and why not the law, why, if there was a promise of marriage, it was not carried out, or at least a demand that it be performed.

Proof of intercourse is not in itself sufficient to sustain a charge of seduction. It is necessary to go further and show that the consent of the female was obtained by promises which, when measured by the age and experience of the parties and every other attending circumstance, makes the struggle between vice and virtue unequal. The law of seduction rests upon a faith in female chastity, and although the case of a plaintiff is attended by a general presumption that she did not willingly lend her body to improper uses, for "Chastity is the general law of society; a want of chastity the exception" (*Crozier v. People,* 1 Park. Cr. Rep. (N. Y.) 453; *State v. Jones,* 80 Wash. 588, 142 Pac. 35), this presumption is not absolute. It does not continue forever. It is attended by a presumption equally necessary to the administration of justice, and that is, that judgment and discretion come with age and experience, and that a woman so fortified will not readily yield to the wiles of a seducer. Her testimony will be more closely scrutinized than that of a younger or more inexperienced woman, for the statute is for the protection of the pure in mind, for the innocent in heart, who may have been led astray or seduced from

the path of rectitude. *Andre v. State,* 5 Iowa 389, 68
Am. Dec. 708. So where it appears that the woman
complaining is of mature years and as worldly wise as
is her paramour, the law will hold her to a stricter de-
gree of proof than a younger woman with less experi-
ence. She must show more than an illicit relation,
she must make it reasonably clear that the citadel of
her virtue fell because of something that is more than
an appeal to her lust and passion or to her mercenary
instincts.

"There should be something more than a mere 're-
luctance' upon her part to commit the act. It should
be a reluctance that enticements and persuasions could
not overcome without the presence of some other po-
tent influence; such a state of facts should be proved as
would convince a fair-minded person that she had been
deceived and deluded, and that her submission was in
consequence of such deception and delusion. To term
coaxing and persuasion of a woman to yield to the
lecherous embraces of a man 'a seduction by artifice,'
would be a misnomer; a virtuous minded woman would
promptly spurn such approaches with indignation.
And if the statute is to receive the construction last in-
dicated—if a woman of mature years is allowed to re-
cover damages for the loss of reputation and character
in consequence of her having permitted a man to have
carnal knowledge of her—she should be required to
show that she had been prudent; had exercised at least
ordinary discretion; had sacrificed her virtue through
an influence that was calculated to lead astray an hon-
est minded female. An action for obtaining property
fraudulently cannot be maintained without proof of
facts calculated to deceive a person of ordinary pru-
dence; and how can a female a long way beyond girl-
hood claim to have been defrauded of that which every
womanly instinct of her nature prompts her to set the
highest value upon, by 'flattery, false promises, artifice,
urgent importunity, based upon professions of attach-
ment,' unless they are of such a character as are calcu-
lated to mislead an ordinarily prudent and virtuous

minded woman?'' *Breen v. Henkle,* 14 Ore. 494, 13 Pac. 289.

The case of *Baird v. Boehner,* 72 Iowa 318, 33 N. W. 694, was very like the one at bar. The illicit relations were brought about in about the same way; they were broken into for a time and later renewed; they covered a period of about two years. In that case, defendant threatened to go with another woman; in this case, defendant promised to give up other women. The court refused to let the verdict stand, saying:

''For the purpose of this opinion, it will be conceded that there was evidence tending to show that the plaintiff had reformed, and was of chaste character in June, 1883. The first time defendant was in company with the plaintiff after her return from Kansas he made an improper proposal to her, and took indecent liberties with her person, that should have shocked a matured woman of chaste character. He proposed sexual intercourse, which she refused, and she objected to the liberties taken with her person. There was, however, no show of indignation on her part at either the proposal or liberties taken. He kept coming to see her, and told her that he loved her, and she thought that if she did 'not give up he would marry her'; and he told her 'If you don't do as I want you to I will go with some other girl.' She then was clearly and explicitly advised that his object in visiting her was to obtain sexual intercourse. This was before the claimed seduction took place. Knowing his object, she permitted him to visit her frequently, and he finally 'accomplished his purpose by telling her he would abandon her, and go with some other girl, and if she would submit to him, he would stick to her.' The plaintiff, therefore, being a chaste woman, yielded her person to the embrace of the defendant, knowing all the time that his object in visiting her was to obtain sexual intercourse, simply because he told her if she did not yield to him he would abandon her and go with some other girl; that is, that he would cease to visit her. It must be remembered that there was no promise of marriage. What was said

in relation to marriage was said in September, and
the claimed seduction took place in the preceding month
of June; nor was there any false promise of any kind.
His declaration that he would abandon her or cease
to visit her clearly cannot be regarded as a false prom-
ise, deceit or artifice. It is true, there is evidence tend-
ing to show that he loved her, and that she loved him,
and that he said 'she had a pretty form, was very
kissable and had pretty eyes.' Whether this was said
before or after the claimed seduction does not appear,
but, conceding it was before that time, sexual inter-
course was not obtained because of the expression of
love, or by reason of flattery. It was not for these rea-
sons that she yielded.''

From the whole testimony, we think it clearly ap-
pears that plaintiff did not surrender her person be-
cause of any promise reasonably calculated to mislead
a chaste woman. Her fortress did not fall by reason of
any sudden assault. She was not shocked by defend-
ant's declared  purpose or his sensual conversation.
She went away from him but returned again and again.
She left on one occasion, at least, resolved that she
would not return to her adulterous life.

We have not discussed the record and quoted from
the cases so much to justify our belief that the court
should have withheld the case from the jury, or that the
jury should have decided in favor of the defendant, as
to demonstrate that the case should not be held to fall
within the rule of the Indiana and Tennessee cases,
whatever the rule hereafter adopted by this court
may be.

An action for tort accrues at the time the wrong is
committed. This rule is universal unless modified by
statute, as, for instance, the statute allowing an action
to be brought within three years after a fraud is dis-
covered, or where the courts have arbitrarily worked an
exception, as has been done by some of them in seduc-
tion cases. As a premise we can agree that plaintiff

had a right of action on the 9th day of April, 1909, if at
all, and we may grant that it would continue until the
relations were broken off and for three years there-
after. But the application of this rule demands that
such intercourse be continuous and referable, directly
or by fair implication, to the original promise, and that
the loyalty of the woman to her expectation of marriage
be unbroken. A woman who abandons her shame and
makes a resolution not to return to it, but who does
return voluntarily and under no new promise, can
hardly be said to be in a position to invoke the unwrit-
ten equity which has been voiced in the opinions relied
on. Plaintiff left defendant in May, June, or July,
1912, and went to Portland. She says:

"I returned in September. When I returned I went
out to my own house at Ross Park. Mr. Day called to
see me there. He came out there and stayed all night.
I hadn't any intention when I came home of living any
more with him."

Plaintiff did not exact a renewal of the promise to
marry, if any was ever made, and there is no showing
of shame or anxiety over her situation for more than
four years thereafter, when this suit was brought.
Under these facts, it would do violence to every rule of
law to say that plaintiff was not bound to bring her
action within three years after September, 1912, for at
that time, and after a voluntary surrender of her obli-
gation to Hera, she made of herself a willing sacrifice
upon the altar of Aphrodite.

We are not justifying the wrong of defendant. His
conduct has been neither moral nor legal. But the law
gives no remedy or damages for illicit cohabitation, or
even for seduction under a promise of marriage, unless
it is brought within three years after the cause of action
has accrued or, *semble,* the relations have been broken
off. Plaintiff ceased to be a seduced person cohabiting

under a continuous promise, if ever she was, in September, 1912. When she turned back on the path of chastity which she had determined to follow, she dropped the bar and set the statute to run.

Reversed and remanded with directions to enter a judgment notwithstanding the verdict.

ELLIS, C. J., HOLCOMB, MOUNT, and PARKER, JJ., concur.