[No. 15635.  Department Two.  October 13, 1920.]

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS
M. STORRS, *Appellant*.[1]

CRIMINAL LAW (221)—TRIAL—RIGHT OF DEFENDANT TO INTERVIEW WITNESS—DISCRETION OF COURT. The right of an accused person to consult with important witnesses for the state is a matter resting largely in the discretion of the trial court, and no abuse of discretion is shown from a denial thereof, where on a charge of seducing one G. it appeared that she was in love with the accused, had been acquitted of murdering accused's wife on the ground of insanity, and was greatly under the influence of the accused.

SAME (451)—APPEAL—REVIEW—HARMLESS ERROR—ARGUMENT OF COUNSEL. Error cannot be predicated upon improper remarks or arguments where the court sustains objections thereto at the time and plainly directs the jury to disregard them, unless they were of such a character that they could not be cured.

SAME (384)—APPEAL—REVIEW. The supreme court will not review alleged error in allowing an attorney to assist the prosecuting attorney, to which no objection was made or exception taken.

SAME (236-1)—APPEAL—TRIAL—OPENING STATEMENT OF COUNSEL. Prejudicial error is not shown by the prosecuting attorney's overstatement of what the state would prove, where he had not had the usual opportunity to consult with the principal witness for the state, and his opening statement was not, generally speaking, unfair.

SEDUCTION (9)—CRIMINAL RESPONSIBILITY—DEFENSES—OFFER TO MARRY—GOOD FAITH. In a prosecution for seduction under Rem. Code, § 2441, providing for a stay of proceedings upon the accused's good faith offer of marriage, it is competent for the state to show that the female seduced had been acquitted of murder on the ground of insanity and was mentally incompetent to accept a proposal of marriage.

CRIMINAL LAW (451)—APPEAL—REVIEW—HARMLESS ERROR—CONDUCT OF COUNSEL. Any prejudice from the prosecuting attorney's question to accused's counsel if he admitted certain matters, is cured where the court on objection immediately instructed the jury to disregard what had been said.

SAME (216) — TRIAL — MISCONDUCT OF JUDGE — COMMENT ON EVIDENCE. In a prosecution for seduction, where the court was called upon to rule as to the admissibility of evidence that the female

[1]Reported in 192 Pac. 984; 197 Pac. 17.

seduced was willing to accept the accused's offer of marriage, she being at the time adjudged criminally insane and mentally irresponsible, a remark by the court "that under the circumstances of this case" he had not the power, and if he had would not exercise his discretion, to receive the evidence, is not an unlawful comment on the evidence.

SEDUCTION (8, 12)—PROMISE OF MARRIAGE—INSTRUCTIONS. In a prosecution for seduction by a married man, it is not error to refuse an instruction that there could be no reliance upon promises of marriage after knowledge that accused was a married man, where promise of marriage was not the basis of the charge and it was plain from the evidence that there never was any reliance on such a promise.

SAME (7, 12)—ACTS CONSTITUTING OFFENSE—PROMISES OR INDUCEMENTS—INSTRUCTIONS. In a prosecution for seduction, it is proper to refuse an instruction that consent must have been secured by reason of some false promise or deceitful inducement, where the instruction was too narrow and another instruction with proper limitations required that there be some artifice, promise, inducement or wiles inducing the consent.

SAME (9)—DEFENSES—PREVIOUS CHASTE CHARACTER—INSTRUCTIONS. In a prosecution for seduction of a woman of previous chaste character, prior acts of sexual intercourse with the accused cannot be shown to overcome the presumption of chastity.

SAME (12)—PREVIOUS CHASTE CHARACTER—PRESUMPTIONS—BURDEN OF PROOF—INSTRUCTIONS. In a prosecution for seduction, an instruction that the presumption of chastity must be overcome by proof of specific acts of prior sexual intercourse is proper, since unchastity cannot be shown by general reputation.

SEDUCTION (11)—EVIDENCE—SUFFICIENCY. A conviction of seduction is sufficiently sustained by evidence of attentions to a girl of eighteen which completely won her love before she learned that the accused was a married man and that she submitted her body to him only after they had become very intimate and had been constantly together, until she had become so madly in love with the accused as to make any sacrifice for him.

MOUNT, MACKINTOSH, MAIN, and MITCHELL, JJ., dissent.

Appeal from a judgment of the superior court for Okanogan county, Jurey, J., entered June 9, 1919, upon a trial and conviction of seduction. Affirmed.

*P. D. Smith* and *W. C. Brown* (*Walter S. Fulton*, of counsel), for appellant.

*W. C. Gresham* and *A. R. Hilen* (*Thos. M. Askren*, of counsel), for respondent.

BRIDGES, J.—Appellant was found guilty of seducing Ruth Garrison. His motions for an instructed verdict and for new trial were denied and judgment of sentence pronounced, from which judgment he has appealed.

(1) The first assignment of error is based upon the alleged fact that the court refused to permit appellant's counsel to interview and consult with the witness Ruth Garrison before or pending the trial of the action. The record shows that, on the day the trial commenced, the appellant moved the court for permission to interview Ruth Garrison, who was one of the chief witnesses in the case, and supported that motion by affidavit to the effect that, prior to and at the time of the trial, Miss Garrison was confined in the insane ward of the state penitentiary at Walla Walla; that he had procured to be issued out of the court an order directing the warden of such penitentiary to produce her as a witness on behalf of the appellant at his trial; and that she had been brought to the place of trial by a penitentiary guard, who refused the appellant's attorneys permission to consult with her. Thereafter the court made an order denying the appellant's motion. The order of denial does not state the reasons therefor. The record further shows that Miss Garrison was a very important witness and was called by the state; that she was fully cross-examined by the attorneys for the appellant; and that, during the course of the cross-examination, but near the close thereof, they were given permission to talk privately, but in the presence of the court, with the witness.

It may be conceded that a person charged with a

crime ordinarily has a right to talk with persons having any knowledge of matters which might be beneficial or detrimental to him. But this right is not of universal application. The matter must of necessity rest largely in the discretion of the trial court; and, where that court has refused to permit the defendant to consult with a witness before the trial, this court should not reverse on that account, except for an abuse of discretion. A very thorough investigation of the question convinces us that the court did not abuse his discretion. The record shows that, before the trial, Ruth Garrison had been tried in another court for the murder of the appellant's wife; that the jury had found her not guilty because of criminal insanity and mental incompetency; that she had been sentenced to the ward for criminally insane persons at the state penitentiary, where she was confined at the time of this trial; that, for a long time before the trial of this case, she had been, and still was, greatly in love with the appellant, and he then had great influence over her; that she was willing to, and, as a matter of fact, did, during the trial, shield and protect him in all honorable ways; and that she was so enamored of him that she would have made almost any sacrifice for him. In fact, the only thing lifting this case above the usual in such cases is the great, uncommon and almost unnatural love of Ruth Garrison for the appellant, always shining through the dross. In the light of all these facts, and possibly others which the record does not disclose and which may have been known to the trial court, the latter well might have concluded that the ends of justice required the making of the order refusing the appellant and his attorneys permission to interview the witness. When we consider the manifest state of mind of the witness toward the appellant, his influence over her, her mental incapacity, and the

fact that she was confined in the penitentiary, we cannot say that the court abused its discretion.

The appellant greatly relies upon the case of *Shaw v. State,* 79 Miss. 21, 30 South. 42, where the court held it was error to refuse the defendant the privilege of conferring with his own witness; and *State v. Papa,* 32 R. I. 453, 80 Atl. 12, where the court held that the attorney for the defendant not only had the right, but it was his duty toward the client, to fully investigate the case and to interview and examine as many as possible of the eye-witnesses to the assault, and that witnesses were not parties and should not be partisans. Those cases doubtless state the general rule; but the facts of those cases were very different from the facts of this case. It has generally been held that questions of this character are within the discretion of the trial court. It was in substance so held in the following cases: *Williams v. State,* 53 Fla. 89, 43 South. 428; *Hudson v. State,* 137 Ala. 60, 34 South. 854; *Robinson v. State,* 8 Okl. 667, 130 Pac. 121; *State v. Goodson,* 116 La. 388, 40 South. 771.

But, should it be conceded that the court abused its discretion, yet a careful reading of the testimony convinces us that the appellant was not prejudiced by the court's action. He does not point out any specific instance where he was so prejudiced. He does not point to any testimony he might have brought out if he had been given an opportunity to interview the witness. At all times she was friendly to him, and on cross-examination testified fully and openly. We cannot, therefore, find any reversible error in the action of the trial court in refusing the interview.

(2) The appellant makes numerous assignments of error based upon alleged improper remarks and improper argument to the jury by, or misconduct of, the attorneys for the state. We have uniformly held that,

where objections are made to an alleged improper remark or argument, and the court at the time sustains the objection and plainly directs the jury to disregard any such remark or argument, we will not hold such as reversible error, unless the argument or remark was of such character as to convince us that the court could not, by his admonitions to the jury, cure the error. *State v. Boyce,* 24 Wash. 514, 64 Pac. 719; *State v. Hawkins,* 27 Wash. 375, 67 Pac. 814; *State v. Wong Tung Hee,* 41 Wash. 623, 84 Pac. 596; *Bunck v. McAuley,* 84 Wash. 473, 147 Pac. 33; *State v. Ackerman,* 90 Wash. 198, 155 Pac. 743.

In common with all other courts, we have always held that we will not review an alleged error to which no objection was made or exception taken. *Rice v. Stevens,* 9 Wash. 298, 37 Pac. 440; *State ex rel. Mackintosh v. Superior Court,* 45 Wash. 248, 88 Pac. 207.

Each of the following assignments of error is controlled by the cases we have cited, to wit, assignment of error No. 2, being a remark made by the prosecuting attorney to the effect that, "I am not trying him for murder;" assignment No. 3½, concerning a remark made by the prosecuting attorney about the Mann Act; assignment No. 7, concerning another remark made by the prosecuting attorney to the effect that, "All the evidence goes to show that he played up in the mind of that little, weak girl;" assignment No. 8, with reference to certain other remarks made by the prosecuting attorney; assignment No. 10, which concerns a remark made by the prosecuting attorney as follows: "I don't think it is anything but by-play, anyway;" assignment No. 16, being a remark by the assistant prosecuting attorney to appellant's attorney as follows: "Do you mean to say that, because a man is quarreling with his own wife, it gives him a right to commit seduction outside his own family?" assignment No. 17, being a

portion of the closing argument of the assistant prosecuting attorney. In each of these instances the appellant's attorney made objection and the objection was sustained, and the court at the time clearly and expressly warned the jury that it should not consider any such remarks or statements. While some of these remarks may have been improper, yet we have no doubt that any detrimental effect they may have had was removed by the court's instructions to the jury. The cases cited by us also dispose of assignment No. 4, where error is claimed because Mr. A. R. Hilen acted as assistant prosecuting attorney. No objection to his so acting was made at the trial, and there was no ruling of the court or request for ruling. Nor do we see any valid reason why he should not have so acted, since he did so at the request of the prosecuting attorney.

(3) A number of errors are assigned based upon the opening statement by the prosecuting attorney, wherein it is claimed he made various assertions as to what the state's testimony would show, when, as a matter of fact, the testimony failed to substantiate such statement. It must be conceded that the prosecuting attorney, in his opening statement, did claim that he would be able to prove certain things which, as a matter of fact, he failed to prove, but most of these matters were of an immaterial nature. The state was required, in the nature of things, to rely for the most part upon Ruth Garrison to make out its case; and she was, in a sense, a hostile witness—hostile in the sense that she was manifestly willing at all times to protect the appellant. It should also be borne in mind that this witness was confined to the insane ward of the state penitentiary, and that the state had not had the usual opportunity to confer with her concerning what her testimony would be. We have read and re-

read the whole of the opening statement and cannot find that the prosecuting attorney was actuated by any malice or venom, or that, generally speaking, the statement was not fair.

(4)    During the trial the state offered, and the court received, in evidence a certified copy of the information charging the witness Ruth Garrison with the murder of Grace Storrs in King county, Washington, and the verdict of the jury at that trial, and also special findings of the jury and the judgment committing the witness, as a criminally insane person, to the penitentiary of the state.  These papers show that the jury acquitted Miss Garrison, but found that, at the time of the commission of the crime and at the time of the trial, she was insane or mentally irresponsible. These certified copies were introduced under the following circumstances: During the course of the trial, the appellant's attorney announced in open court that the appellant was willing to, and would at once, or at any time to be fixed by the court, marry Ruth Garrison, and stated that such proposal of marriage was made in good faith.  The statute with reference to seduction is as follows:

"Every person who shall seduce and have sexual intercourse with any female of previous chaste character, shall be punished by imprisonment in the state penitentiary for not more than five years or by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both fine and imprisonment.  Provided, that if at any time before judgment upon an information or indictment, a defendant shall marry such female, the court shall order all further proceedings stayed; . . ." Rem. Code, § 2441.

The state offered these certified copies in evidence for the purpose of showing, or tending to show, that Ruth Garrison was incompetent to accept a proposal

of marriage, that she was criminally insane and mentally irresponsible, that she was at that time confined in the penitentiary, and that the appellant's proposal of marriage was not made in good faith. We have no doubt the testimony was perfectly competent for these purposes.

(5) It is next earnestly contended that the prosecuting attorney demanded that the appellant admit certain matters involved in the trial. There is no merit in this contention. The prosecuting attorney asked the appellant's attorney the following question: "Do I understand, Mr. Smith (attorney for the appellant), that the defense admits that Plaintiff's Exhibits 14, 15, 16 and 17—" Thereupon the appellant's attorney objected to the prosecuting attorney calling upon the appellant to make an admission. The court at once allowed an exception and instructed the jury to disregard what the prosecuting attorney had said, or any request made by him. In the first place, the prosecuting attorney did not request the appellant to make any admission, and secondly, if he had made such, it was cured by the ruling of the court.

(6) After the appellant's counsel in open court expressed the willingness of the appellant to marry Ruth Garrison, he asked and received permission to make her his witness. After having so done, he asked her whether she was willing to marry the appellant. The state's attorneys objected to this question and, after argument, the court started to rule on the question of the proposed marriage, and in so doing stated that he usually preferred giving his reasons for any rulings which he might make, but that, when ruling in the presence of a jury, he always greatly limited his expressions of reasons for the ruling, lest he might say something which would cause a mistrial; and he then proceeded as follows:

"Now, whatever may be right and proper and permissible in the ordinary seduction case, I am thoroughly satisfied that by reason of the conditions and facts of this particular case that this court has no jurisdiction, power or right to allow or permit anything of the nature of the question, and if the court had the power and the right and the jurisdiction to allow or permit such, it was in the discretion of the court, and by reason of the condition and the facts of this case the court would not permit it, so the offer will be rejected and the motion denied and exception allowed."

It is contended that the court commented on the evidence to the effect that, in his opinion, this was not an ordinary, but an aggravated, seduction case. Counsel for the appellant have extensively and seriously argued this question. We are frank to say that, in our opinion, they entirely misconstrue the expression or intention of the trial court. The court had before it, for a ruling, an offer of marriage to a woman who was at that time confined to the penitentiary, and who had been adjudged mentally incompetent. The court simply meant to say that such facts were unusual, as indeed they were. There is nothing in the court's expression to indicate that he thought that the case on trial was unusual. We cannot conceive that the jury could have misconstrued the court's meaning. Nor can it be said that the court in anywise commented upon the evidence. It was doing nothing more than giving its reasons for denying the appellant's motion to discontinue the case on the ground of his offer of marriage. The numerous cases cited by the appellant in support of his contention do not, in our opinion, lend any light to the subject.

(7)   The appellant requested the court to give eight separate instructions, and assigns separate error for the refusal of the court to give any of them. His requests Nos. 3, 4, 5, 6, 7 and 8 need no special comment

from us.  They were either covered in substance by
the court's instructions or were argumentative or im-
properly stated the law of the case.  The only re-
quested instructions we deem it necessary to particu-
larly notice are Nos. 1 and 2.  No. 1 was to the effect
that, if Ruth Garrison knew, prior to the time she sub-
mitted her body to the appellant, that he was a mar-
ried man, then any promises of marriage made to her
by the appellant after such knowledge on her part
could not have deceived her, and she would not have
been justified in relying upon them.  It probably would
have been proper to have given this request had prom-
ise of marriage been the basis and cause of the seduc-
tion.  While the testimony shows that Ruth Garrison
knew the appellant was a married man at the time she
submitted her body to him, and that there had been
some general talk between them to the effect that he
might obtain a divorce and might thereafter marry
her, yet these matters were purely incidental; they
were not inducing causes.  Her testimony makes it
perfectly plain that she did not submit to him because
of any promise of marriage; and, in fact, that there
never was any such promise.  Under these circum-
stances, it was not error for the court to refuse to give
the requested instruction.  Appellant's request No. 2
is as follows:

"To constitute the offense of seduction under our
statute, it must appear from the evidence, beyond a
reasonable doubt, that Ruth Garrison yielded her per-
son, and submitted to have sexual intercourse, by
reason of some false promise or deceitful inducement
held out to her by the defendant, and that by reason
of such false promise or deceitful inducement she was
drawn aside from the path of virtue, yielded to the
defendant, and had sexual intercourse with him."

The court refused this request, and in its stead gave
the following instruction to the jury:

"In order to constitute the offense (of seduction), it must be shown by the proofs in the case, beyond a reasonable doubt, that at the time alleged in the information, Ruth Garrison yielded her person and her virtue by reason of some artifice, promise, inducement, persuasion, deception or wile of said Douglas M. Storrs, made at that time or at any previous time, and without which she would not have yielded. The artifice, promise, inducement or wiles are not limited to the time the act of sexual intercourse occurred, but, if you find, from the evidence, beyond a reasonable doubt, that by persistent attention or by promises or inducements or persuasions from time to time, the said Douglas M. Storrs built up such respect and love in Ruth Garrison for himself as to finally and eventually overcome her virtue and induce her to voluntarily yield by these means, then you should find him guilty, as charged."

The instruction requested was altogether too narrow. Under it the appellant could not be found guilty unless the jury believed he had accomplished his purpose on Ruth Garrison by reason of false promises or deceitful inducements.

To be guilty of the crime of seduction it is not necessary that the promises of the seducer should be false or that his inducements should be deceitful. Otherwise, a man who accomplishes his purpose under promise of marriage would not be guilty of seduction if his promises were made in good faith.

In the case of *State v. O'Hare*, 36 Wash. 516, 79 Pac. 39, 104 Am. St. 970, 68 L. R. A. 107, we said:

"The word 'seduce' in this statute is used in its ordinary legal meaning, and implies the use of arts, persuasion, or wiles to overcome the resistance of the female who is not disposed, of her own volition, to step aside from the path of virtue. No doubt the most common method of enticing an unmarried, virtuous woman from rectitude is by promises of marriage, but there are other arts, wiles, and promises which may

be made, and which may be acted upon by a virtuous woman.''

(8) Complaint is made of the following instruction of the court:

''Insofar as the case now being tried is concerned, prior acts of sexual intercourse which the defendant himself committed with the said Ruth Garrison under the same or similar circumstances, cannot be considered by you in determining the chastity or unchastity of the said Ruth Garrison. Insofar as those acts are concerned, she would be of previously chaste character. Other acts of sexual intercourse, aside and apart from those, must be shown to overcome the presumption of chastity which the law gives to every female person.''

This instruction is in accordance with the previous rulings of this court. *State v. Sargent,* 62 Wash. 692, 114 Pac. 868, 35 L. R. A. (N. S.) 173; *State v. Tilden,* 79 Wash. 472, 140 Pac. 680.

(9) The court instructed the jury that:

''Every female person is presumed to be of chaste character, and this presumption must be accorded to Ruth Garrison in this case until such time as the defendant shall prove, by specific acts of sexual intercourse committed prior to the date alleged in the information, that the said Ruth Garrison was physically unchaste.''

Particular complaint is made of that portion of this instruction which requires the defendant to overcome the presumption of chastity by proof of ''specific acts of sexual intercourse . . .'' We think the instruction states the law correctly, particularly when read in connection with the other instructions covering the same subject-matter. What the court had in mind was that the appellant could not prove unchastity by proving general reputation in that regard, but he must prove to the satisfaction of the jury that Ruth Garri-

son had been guilty of the specific act of sexual intercourse. Chastity is an existing personal virtue, not a reputation. A bad reputation cannot any more make a woman unchaste than a good reputation can make her chaste. What the appellant was required to prove was actual unchastity, not reputation for unchastity. *State v. Workman*, 66 Wash. 292, 119 Pac. 751; *State v. Jones*, 80 Wash. 588, 142 Pac. 35.

Complaint is also made of other instructions of the court. We cannot here present them in detail. We have carefully considered them. We find no error in them.

(10) It is finally contended that the evidence was insufficient to prove the crime of seduction. This assignment will require us to recite the substance of the testimony. When Ruth Garrison first met the appellant, she was working in the courthouse in the city of Seattle. She was eighteen years of age and he was twenty-six. He was working in the sheriff's office in the same building. He had quite often spoken to her, and on a certain afternoon invited her to ride with him in his automobile to her home, which invitation she accepted. At that time she thought he was an unmarried man. On the same evening he called on her and took her for a ride. He called on her quite frequently during the immediately following days and weeks. During this period he did not inform her that he was married, and she continued to believe he was single. She did not learn of his marriage until some time after she had met him, and then she learned it accidentally by telephoning to his wife in an effort to talk over the telephone to him. The testimony clearly discloses that, at the time she learned he was married, she was very greatly under his influence and completely in love with him. He gave her to understand that there was very little affection between himself and his wife. He con-

tinued to pay attentions to her, taking her to ride in his automobile, often expressing to her his admiration of and love for her, and constantly treating her as a sweetheart. At this time she was manifestly madly in love with him and would have made almost any sacrifice for him. A few weeks after their first acquaintance he took her with him to Everett, where they stopped at the same hotel during the night. At that time the appellant suggested intimate relations with her, which she refused. Thereafter he constantly called upon her and she willingly submitted to all of his embraces. At times she was required to deny him the privileges of her body. Later he went from Seattle to Okanogan city, in Okanogan county, Washington, where he worked as a mechanic. There was considerable correspondence between them. Her trust in him and her love for him at once induced her to go to him. At the hotel in Okanogan she was registered as his wife. They were very intimate and very attentive one to the other and were almost constantly together. On the first night she was in Okanogan, she again refused his solicitation that she submit her body to him; but on the second night he accomplished the act of sexual intercourse. This, in brief, is the story. We have no doubt there was ample proof to require the case to go to the jury on the question of seduction. To speak plainly, and in the substance of the language of some-one else, it cannot be said that the testimony shows the act of sexual intercourse was the matching of the passions of the one against those of the other. The appellant greatly relies on the case of *Rockwell v. Day,* 101 Wash. 580, 172 Pac. 754. Whether one be guilty of seduction must depend on the facts, and the facts of that case are very different from the facts here. There the woman was forty-two years of age and had two grown daughters, and she was worldly

wise; here the girl was but eighteen. In that case there was an absence of showing of love and affection on the part of the woman, whereas here existed all the trust and love it is possible for one to possess. These are only a part of the distinctions between the two cases. The significant facts and the general atmosphere of the two cases have but little in common.

There are other assignments of error of less important nature. We have very carefully considered them, but do not find merit in them. This opinion is already too extended to discuss them in detail.

We are convinced the appellant received a fair trial and we will not disturb the judgment, which we affirm.

HOLCOMB, C. J., FULLERTON, and TOLMAN, JJ., concur.

MOUNT, J. (dissenting)—If the first nine points discussed in the majority opinion controlled the judgment in this case I might readily assent thereto. But, in my opinion, after carefully reading the evidence in the case, there is no evidence whatever of seduction. The prosecution relied wholly upon the testimony of Miss Ruth Garrison, who is alleged to have been seduced by the appellant. The evidence very clearly shows that, for some weeks, at least, prior to February of 1919, Miss Garrison and the appellant were very much in each others company. When they were together they would hug and kiss each other, and both, no doubt, were much in love. About the first of February, 1919, the appellant left Seattle, leaving behind his wife and Miss Garrison, and went to Okanogan, in Okanogan county, a place distant about 250 miles from Seattle. The appellant was employed at Okanogan as a mechanic in an automobile repair shop. After he had been there a few days he received a letter from Miss Garrison, the prosecuting witness, in which she said:

"Listen, Lover man. You know I'm not working at the Bureau any more. I quit, and by the way, they're some sore about it, too. I don't want to start working again till I find out just what's to happen about the strike. Please, Doug., won't you let me come over there just for, say—oh—come Friday and stay until Sunday? It will be my only chance, 'cause the next job I get won't be as easy as the court house to get away from. See? And I'd be satisfied to start in work right if I could just see you. Please, please, Douglas—I know it's a wee bit expensive, but I worry. I want to see you. I'll eat bread and water after I come back to make up for it. Please, please, Please!!! If they know you're married, then I'll pass as your sister, or anything, I don't care what. Oh! please say yes, Doug., just this once. If you don't get this soon enough to answer on paper, send me a wire. And Doug. I've sent a lot of letters to just 'Okanogan,' so look them up."

Before receiving a reply to this letter, Miss Garrison sent appellant a telegram, as follows: "Am coming Saturday 8 p. m. If not O. K. wire." This telegram was sent on Friday, and the following Saturday she arrived at Okanogan. Mr. Storrs met her at the depot and took her to the Bureau Hotel, where she was registered as Mrs. D. M. Storrs. She testified as follows:

"Q. Did you have separate rooms or otherwise from him? A. Separate. Q. How long did you maintain that separate room? A. All the week that I was there. Q. Did anything occur between you of an intimate nature at all that first night? A. Mr. Storrs was in my room. Q. What happened? A. Nothing in particular, he loved me of course. Q. Just give that a little louder. A. Mr. Storrs was in my room for a while and I went to his room and back and forth between the two rooms. Q. What was done? A. Why, he loved me. Q. Was there any act of intercourse that night? A. No. Q. What was the number of his room, if you remember? A. I don't know for sure. I think it was 25. Q. Had you been in his room before that? A. I had. Q. Had

you ever been on his bed before that? A. Yes. Q. What time of day was it when this first act of intercourse occurred between you, do you recall? A. At night, I think. Q. Just the night time. Had you dressed or undressed in his room or your own room? A. In my own room. Q. And how were you dressed when you went to his room? A. In my kimona. Q. Did you go back to your room that night at all? A. I did not. Q. Was there more than one act of intercourse that night? A. No. Q. Now, after that, I will ask you whether or not you slept with him every night? A. I did. . . . Q. Did he ever deceive you in any way that you know of, that is, after you knew that he was married? Did he ever practice any deceit on you that you know of? A. No. Q. Did he, or did you submit to sexual intercourse with him by reason of any trick or deceit that you know of? A. No. Q. Did you and he participate in that indulgence solely for the—from the fact that you were both infatuated with each other and for your mutual enjoyment? A. Yes.''

These facts are undisputed in the record.

The statute defining seduction, quoted in the majority opinion, is:

''Every person who shall seduce and have sexual intercourse with any female of previous chaste character, shall be punished by imprisonment,'' etc.

The word ''seduce,'' as used in this section, has a well known meaning. In Bouvier's Law Dictionary, Rawle's Third Revision, seduction is defined as follows:

''The act or crime of persuading a female, by flattery or deception, to surrender her chastity. Webster.

''The corrupting, deceiving and drawing aside from the path of virtue which she was pursuing of a virtuous woman, by such acts and wiles, in connection with a promise of marriage, as were calculated to operate upon a virtuous woman. *State v. Eckler,* 106 Mo. 585, 17 S. W. 814, 27 Am. St. Rep. 372.

''The wrong of inducing a female to consent to unlawful intercourse, by enticements and persuasions

overcoming her reluctance and scruples. *Hood v. Sudderth,* 111 N. C. 215, 16 S. E. 397.''

In *State v. O'Hare,* 36 Wash. 516, 79 Pac. 39, 104 Am. St. 970, 68 L. R. A. 107, we said:

''The word 'seduce' in this statute is used in its ordinary legal meaning, and implies the use of arts, persuasion, or wiles to overcome the resistance of the female who is not disposed, of her own volition, to step aside from the path of virtue.''

The court in his instructions to the jury gave the following instruction, which the majority holds to be correct:

''In order to constitute the offense it must be shown by the proofs in the case, beyond a reasonable doubt, that at the time alleged in the information, Ruth Garrison yielded her person and her virtue by reason of some artifice, promise, inducement, persuasion, deception or wile of said Douglas M. Storrs, made at that time or at any previous time, and without which she would not have yielded. The artifice, promise, inducement or wiles are not limited to the time the act of sexual intercourse occurred, but, if you find, from the evidence, beyond a reasonable doubt, that by persistent attentions or by promise or inducements or persuasions from time to time, the said Douglas M. Storrs built up such respect and love in Ruth Garrison for himself as to finally and eventually overcome her virtue and induce her to voluntarily yield by these means, then you should find him guilty, as charged.''

There is no evidence whatever in this case that the appellant at any time used any artifice, promise, inducement or persuasion, or deception, to cause Miss Garrison to yield to his request for sexual intercourse, nor that such request was made by appellant. It is true that, upon previous occasions, he had hugged her and kissed her and she had returned these demonstrations of love. When he had suggested improper relations she had repulsed his advances. There is no evi-

dence whatever that at any time he persuaded or induced her to yield to his desires by any artifice, or flattery, or deception. Without some of these elements there could have been no seduction. The evidence conclusively shows that she solicited the right to come to him from Seattle to Okanogan. Before he had time to reply to her request she sent a telegram stating that she was coming. After she arrived there she was registered as his wife. She was assigned to a separate room. According to her own testimony, she voluntarily went to his room and had sexual intercourse with him. In answer to the question, "Did you and he participate in that indulgence solely from the fact that you were both infatuated with each other and for your mutual enjoyment," she answered "Yes." It seems clear to me that there could be no seduction in a case of this kind. She voluntarily stepped aside from the path of virtue. The utmost that can be said of the evidence in this case is that the appellant was guilty of the crime of adultery, which is an independent crime and can only be prosecuted upon complaint of the husband or wife. Rem. Code, § 2457. But he was not charged with that crime, he was charged with the crime of seduction, and it was necessary to prove that the seduction was brought about by persuasion, flattery or deception. Miss Garrison denied that anything of that kind occurred. She, in substance, invited sexual intercourse when she said in her letter, above quoted, "I'll pass as your sister, or anything, I don't care what." It cannot be assumed that there was any act of sexual intercourse between these parties prior to the visit of Miss Garrison to Okanogan, because the direct and positive evidence is to the contrary. It is probably correct to say, as is said in the majority opinion, that Miss Garrison was madly in love with the appellant. She evidently loved him with her whole

soul.  She voluntarily had sexual intercourse with him
to hold his love for her.  She indeed went to greater
length after that time.  She even murdered his wife,
that the wife might not be between them.  She was
acquitted of the charge of murder because the jury
which tried her for that crime found that she was in-
sane at the time.  There was no evidence of insanity
at the time of this trial.  She testified as rationally
and as clearly as any person could.  She was the sole
witness for the state upon the main points in this case.
She was not disputed in any of her statements.  The
state, of necessity, vouched for her sanity and her
truthfulness and relied upon her testimony, which, it
seems to me, would convince any one that she was not
seduced, but indulged in the act of sexual intercourse,
as she said, for their "mutual enjoyment."  In my
opinion, it was the duty of the court to direct a verdict
of acquittal.  The judgment should therefore be re-
versed.

I therefore dissent from the conclusion reached by
the majority.

### ON REHEARING.

[*En Banc.*  April 5, 1921.]

PARKER, C. J.—From a painstaking review of the
record in this case, after hearing the argument of
counsel for the respective parties upon a rehearing
*En Banc,* we feel constrained to hold that the judg-
ment of conviction rendered against appellant must
be affirmed; as was concluded by the majority of the
judges upon the first hearing of the cause in Depart-
ment Two of this court.

We have taken particular pains to critically read all
of the evidence as found in the statement of facts,
rather than as found in abridged form in the abstract
thereof prepared by counsel, with a view of determ-

ining whether or not the question of appellant's guilt should have been taken from the jury and decided by the court in his favor as a matter of law; that being the question to which the argument of his counsel was for the most part directed upon the rehearing. We think there need be but little said here in addition to what is said in the majority department opinion on that question. We note that the argument of counsel for appellant, as does our brother Mount's opinion dissenting from the conclusion of the majority department opinion, seems to proceed upon the assumption that the prosecution relied practically wholly upon the testimony of Ruth Garrison. If we could so view this record, it is possible we could come to our brother Mount's conclusion; but we cannot so view the record. The testimony of the proprietor of the hotel at Okanogan was, in substance, that appellant and Ruth Garrison lived for some time at his hotel, to all outward appearances as man and wife, both occupying the same room. Two other witnesses testified to admissions made by appellant that sexual intercourse took place between him and Ruth Garrison at that hotel at about the time charged, as will appear in testimony presently to be quoted. It therefore seems to us that there was testimony tending strongly to support the fact of sexual intercourse between them at the time charged, wholly independent of Ruth Garrison's testimony. Touching the question of appellant's efforts to have Miss Garrison submit to intercourse with him at Seattle before he went to Okanogan, we have the testimony of two witnesses—a deputy prosecuting attorney of King county and an officer of the city of Seattle—as to what appellant said to them, touching that question, in an interview they had with him about March 19th, upon his return to Seattle from Okanogan. The testimony

of the deputy prosecuting attorney touching that interview was in part as follows:

"A. We started out by asking Storrs what he knew about the murder of his wife. He said, 'Nothing.' He said that he knew nothing. He said that he hadn't heard of her death even or how she had come to her death until he reached Wenatchee, when he read it in the paper. We asked him then when his relations had first been intimate with the Garrison girl, specifically when he had first had intercourse with her. He said that his first act of intercourse with her was in Okanogan. We said to him that he had been calling on the girl almost nightly at her apartment. He said yes, that was true. We said, 'You stayed there sometimes as late as two o'clock in the morning?' He said, 'Yes, that is true.' We said, 'You attempted repeatedly to have intercourse with her?' He said, 'Yes.' We said then, 'Don't you think it is an unreasonable sounding story that you never did succeed in having intercourse with the girl until she came to Okanogan?' He said, 'Yes, I know it doesn't sound like the truth, but it is the God's truth.' I believe those are the exact language he used in that regard. He said that he had received a letter one morning while he was here in Okanogan from her, stating that she would be here on the night train, and that there was nothing left to do but to go down to the train to meet her; that he had taken her to the Bureau Hotel and registered her as Mrs. Storrs; that she had occupied room 17, and he was living in room 25; that she occupied that room for a few days before she moved into his room, but she had stayed here about a week, a few days more or less, and then had left; that the next time he saw her, he was out at the moving picture show one evening, and after the show he went back to the hotel, and when he went to his room at the hotel he found her in bed there."

The city officer, who was then present and participated in the interview, in his testimony corroborates the above-quoted portion of the deputy prosecuting

attorney's testimony. The testimony of these two wit-
nesses, it seems to us, lends strong support to the view
that, in the accomplishment of the final act of inter-
course at Okanogan, she was seduced by appellant, that
is, that she did not yield to him merely because of her
desire to gratify her physical sexual passions. The
act punishable by our statute (Rem. Code, § 2441) is
to "seduce and have sexual intercourse with . . ."
The decisions seem not to furnish any well-defined gen-
eral rule as to what the word "seduction" means when
used as in this statute. When we exclude the thought
of a mere gratification of physical sexual passions and
the selling by a woman of her body to a man, prac-
tically all other inducements which cause her to yield
seem to be properly left to the jury to decide, as to
their sufficiency to constitute seduction. We are im-
pressed with the observation made by Justice Thomas,
speaking for the court of appeals of Alabama, in *Smith
v. State,* 13 Ala. App. 399, 69 South. 402, as follows:

"What temptation, deception, arts, or flattery may
be sufficient in one case to overcome the will of the
woman and cause her to surrender her virtue may not
be sufficient in another case—depending, as it does,
upon the relative moral and intellectual strength of
the man and the woman, their respective positions in
society, the vantage ground of the man, the weakness
of the woman, her necessities, and a variety of condi-
tions and circumstances peculiar to each case, which
must be judged of by the jury. And therefore, when
any temptation, deception, arts, or flattery at all are
shown, it must be left to the jury to say whether it or
they were sufficient, and whether it or they did in fact
induce the intercourse, or whether the intercourse was
the result of merely a desire on the part of the woman
to gratify her sexual passions or deliberately to sell
herself for a consideration, uninfluenced and not super-
induced by the arts and wiles of the man."

Viewing the whole history of this love affair between these two people from the time of its inception to the final consummation of their act of sexual intercourse here in question, we cannot escape the conclusion that it was for the jury, and not for the court, as a matter of law, to say whether or not Ruth Garrison yielded her body to appellant because of his persuasion, wiles and arts practiced upon her, rather than as the result of her mere desire to satisfy her physical sexual passions. The jury could well believe that it was the former and not the latter that caused her to finally yield.

We have reviewed and re-examined the questions of law incident to appellant's motion for a new trial, and have become convinced that they have all been properly disposed of by the majority opinion rendered by Department Two.

The judgment is affirmed.

FULLERTON, HOLCOMB, TOLMAN, and BRIDGES, JJ., concur.

MACKINTOSH, J. (dissenting)—While I believe that the dissenting opinion written by Judge Mount, upon the first hearing of this case is correct, and that the evidence in the case upon the appellant's guilt of seduction did not justify its submission to the jury, I am willing to admit that the majority of the court may be correct in arriving at the contrary conclusion, but I am satisfied, beyond any doubt, that the majority is incorrect in not, at least, granting the appellant a new trial, and for this reason:

The record shows that Ruth Garrison, then an inmate of the state penitentiary, was brought in attendance at the trial upon the application of the appellant, and was subpoenaed as his witness; that, after

her arrival in Okanogan county, the appellant and his counsel were by the court denied the right to confer with her or to have any communication with her whatever, although the prosecuting attorney and his assistants were allowed to talk with her at will. In the very nature of the case, she was the most material witness that the appellant could have, and it was of the supremest importance to him that he and his counsel should know what her testimony might be before she took the stand, especially as she had been subpoenaed in his behalf. The constitution of this state provides that every person charged with crime shall have compulsory process in obtaining witnesses in his favor, and under the laws of this state it is made obligatory upon the prosecuting attorney to indorse upon the information the names of the state's witnesses for the purpose of allowing the defendant an opportunity to investigate them and interview them before trial. If the names of the state's witnesses are not so indorsed thereon, their testimony cannot be used (except in rebuttal), and if the defendant has this right in regard to the state's witnesses, how much more should his right to interview his own witnesses be safeguarded?

I do not understand how a court can say that it is a matter lying within the discretion of the trial court to allow or disallow the defendant this right. It was a plain, arbitrary abuse of power to prevent appellant and his counsel from seeing and talking to his own witness before the trial. The fact that this witness may have been in the custody of the officers of the state is only a stronger reason for preserving the appellant's rights. This abuse of power becomes more apparent when we consider that the state's attorneys were allowed to interview this witness at will before she was

placed on the stand. The record discloses that the witness had been adjudged insane. The record also discloses that she was in a friendly state of mind toward the appellant, yet we find her called as a witness by the state, although subpoenaed by the appellant, after the appellant had had no opportunity of eliciting from her any information in advance, and the inference must be that the interviews which the state was permitted to have with her resulted in prejudice to the appellant. It is no answer to say that cross-examination by the appellant might nullify the damage done by denying him his right, for the reason that intelligent cross-examination largely depends upon knowledge obtained beforehand. It is not always safe for the most skillful attorneys to cross-examine a witness about whom they have no previous information. As was said in the case of *State v. Papa*, 32 R. I. 453, 80 Atl. 12:

"The defendant, therefore, has the constitutional right to have compulsory process for obtaining witnesses to testify in his behalf. He has also the right, either personally or by attorney, to ascertain what their testimony will be."

This right is so fundamental and has been so universally respected that no authority can be found which has denied it. For this reason the appellant was, at least, entitled to a new trial, and I therefore dissent.

MAIN and MITCHELL, JJ., concur.

MOUNT, J. (dissenting)—I still adhere to my dissent to the original opinion. The evidence quoted in the majority opinion above does not even tend to show seduction in Okanogan county, where the crime was alleged to have been committed. I also concur in the dissent of Judge Mackintosh.