[No. 28561.   Department One.   July 2, 1942.]

MARGARET M. JONES, *Respondent,* v. JAY C. ALLEN, *Appellant.*[1]

<sup>1</sup>Reported in 127 P. (2d) 265.

*Adam Beeler, Charles R. Carey,* and *John F. Walthew,* for appellant.

*Simmons & McCann,* for respondent.

STEINERT, J.—Plaintiff instituted this action seeking to recover from defendant damages in the sum of two hundred fifty thousand dollars for an alleged breach of promise of marriage. The cause was tried to a jury, which returned a verdict for ten thousand dollars in favor of the plaintiff. The defendant's alternative motions for judgment notwithstanding the verdict or for a new trial were denied, and judgment was thereupon entered in the amount of the jury's award. The defendant has appealed.

The trial of this action in the court below consumed nine days. The record presents a statement of facts of over a thousand pages, together with many exhibits. Among the exhibits is included respondent's personal diary which alone covers eleven hundred ninety closely written pages purporting to narrate in chronological order the intimate events, and consequences thereof, growing out of the relationship formerly existing between the parties here concerned. We shall not attempt, nor is it necessary, to recite in detail the course of conduct of the parties during the continuance of that relationship as shown by the record, but will confine ourselves to a statement of only so much as is required for a proper understanding and determination

of the issues here involved. Moreover, in view of our disposition of this appeal, we shall base our statement upon the evidence adduced by respondent, upon which is predicated her claim for a recovery herein, although her testimony concerning any promise of marriage or any agreement having marriage as an objective was emphatically denied by appellant.

The parties met each other in 1909, when appellant was forty-one years of age and respondent was twenty-seven. Both were then married, the appellant to Laura Allen and the respondent to William F. Jones. Shortly after their meeting, the respondent and her husband, together with their seven year old son, moved into the vicinity of the Allen home. By 1911, the acquaintanceship between respondent and appellant had ripened into an infatuation, and they were meeting each other frequently in various rooms which appellant maintained for that purpose in the business section of the city of Seattle. Many of these meetings culminated in sexual intercourse between the parties. During this period, they orally agreed to divorce their respective spouses and marry each other. In the spring of 1911, respondent, having separated from her husband a short time before, instituted an action for divorce against him. Her action was contested but ultimately resulted in a final decree of divorce in November, 1912. Since that time, she has gone by her maiden name, Margaret M. Gable. Appellant, on the other hand, made no endeavor to procure a divorce from his wife, as he had agreed to do, but nevertheless, by extravagent promises and protestations of affection, induced respondent to continue the relationship above described.

From 1911 to 1916, except for a few months in 1914 when Mr. and Mrs. Allen were in Europe, respondent and appellant spent a part of almost every day to-

gether, and he was paying the greater part, if not all, of her living expenses.

During this period, Mrs. Allen made strenuous efforts to break up this relationship, even going to the extent of publicly assaulting respondent on three different occasions. The last of these attacks took place in 1916, when Mrs. Allen broke an umbrella over respondent's head. In consequence of that aggression respondent had Mrs. Allen arrested upon a charge of third degree assault. In the trial of that action, the matter of the relationship existing between the respondent and the appellant appears to have been revealed, and as a result of that exposure respondent promised that she would not see the appellant again. From the time of that trial in 1916, the parties did not meet or see each other until 1934, except for a single occasion in 1920 when appellant prevailed upon respondent to spend the night with him in a Seattle hotel.

From about 1920 until the summer of 1933, respondent resided in California, where she earned her own living as a beautician and cosmetic saleswoman. During that period she received no financial assistance from appellant and did not even communicate with him until the early part of 1933, when she was compelled to go on public relief. She thereupon wrote to her son, who was living in Seattle, asking him to see whether appellant would purchase some real estate which she then owned. Appellant indicated that he was not interested in the property, but he gave her son one hundred dollars, which the latter forwarded to his mother.

In August, 1933, respondent returned to Seattle, but at first made no effort to see appellant. On January 21, 1934, however, Mrs. Allen died, and within a few days thereafter respondent sent her son to make an appointment for her to consult appellant about some business

matter.  Pursuant to that appointment, respondent called at appellant's office.  Following this, she made frequent visits at his place of business, with the result that in a short time the parties entered upon a relationship of intimacy similar to that which had existed between them twenty years previously.  Appellant thereafter continually paid respondent's rent and carried a key to her apartment, to which he had free access at any and all times.  He also paid her doctor and hospital bills and defrayed most of her other living expenses, it appearing that she had little, if any, income other than the money he gave her.  He sent her flowers, fruit, candy, liquor, and other luxuries, and often took her for a drive or to dinner.  He frequently visited her apartment for rest, relaxation, refreshment, and companionship, and she sometimes rendered him the services of a manicurist and masseuse.  However, he never introduced her to members of his family, and to but few of his friends.  She therefore complained in her diary that he acted as if he were ashamed of her and that he seemed to regard her simply as his mistress.  But at the trial of the present action she testified that he frequently avowed his affection for her, renewing from time to time his promise of marriage, and speaking of the future when they would travel and be happy together.  At other times, however, they engaged in violent quarrels, which became more and more frequent and finally culminated in two severe beatings inflicted upon respondent by the appellant in 1936.

This general state of affairs continued until February, 1938.  During the intervening period, respondent was twice injured in automobile accidents and brought two actions for damages, retaining the legal services of appellant's law firm.  These suits were both successfully terminated by the early part of 1938, and on

February 3rd of that year a final settlement with respect to the proceeds thereof was made between respondent and her lawyers.

By 1937, however, as disclosed by respondent's diary, she had become thoroughly convinced that appellant did not intend to marry her, and she therefore attached no credit to his promises and continued expressions of affection. A number of entries in her diary reveal also that she had by that time firmly resolved to sue appellant for breach of promise as soon as her two personal injury actions should be determined. The final settlement of her claims on February 3, 1938, therefore removed all impediments to her contemplated action against him.

This latter date is also important because respondent avers that appellant then made his final promise to marry her. As alleged in her complaint, no definite date of marriage was ever set. In fact, the record shows that at no time was there any very explicit agreement between the parties that they would marry. Respondent's testimony was almost wholly confined to instances when the appellant would simply express his fervent affection for her and speak of the time when all his promises would be fulfilled. During the course of the trial below, respondent was required to elect a specific promise as the basis for her action and, after taking exception to the ruling of the court, chose to rely upon this final promise of February 3, 1938. In order that we may have before us the exact terms of that promise, as claimed by respondent, we quote her testimony concerning the incident:

"Q. Was there anything happened on that particular date? A. Yes, after it [the matter of the damage actions] was all settled, I told him I was very well satisfied. . . . He gave me my check . . . and we went for a ride. Q. You and Jay? A. Yes, Jay and I went for a ride. Q. Where did you go and what

was said? A. Around the properties [which appellant had previously pointed out to her as belonging to him], and out to Three Tree Point, and we stopped and visited. He told me how much he loved me. Q. Where was this? A. Out by Three Tree Point. I cannot tell you. I didn't—and he said, 'Well, Margaret'—of course we were riding quite awhile and sitting quite awhile, and he said, 'Margaret, now soon everything is going to be all right with us. It won't be now, but just a little while until I can get everything settled up, and I can just tell you everything,' and he said, 'I will keep every promise I ever made to you.' Q. Did you make any response to that remark? A. Yes. Q. What did you say? A. I said, 'Oh, I am so happy, Dear.' And I said,—'Do you mean'—I said, 'Do you mean?' I said, 'Then we will be married, as you promised, you will give me your name and I will have respect.' Q. And what did he say? A. He said, 'Yes, Margaret, absolutely.' He said, 'But I can't tell you now. I won't even trust myself to tell you. Just soon now, just as soon as—' he said, 'Just the minute it is all settled I will tell you everything. It is just as soon as I know, the money and the properties I get out of the estate [of Laura Allen, appellant's deceased wife], but', he said, 'There has been so many slips, we have been held up so many times.' I says, 'I don't care. I don't care, Dear. All I want is just for us to be happy.' I cried and he said—I said—he said, 'What I want is to get it and get away from those Claibornes [his deceased wife's children by a former marriage]'. He said, 'I am going to retire from business and travel.' I said, 'Oh, Jay, that is what you always said we would do.' And he said, 'Yes, and that is what we are going to do, absolutely, Margaret, and I will make up for all the lost times.' And I said to him, I said, 'Don't hold out too long, because we don't—what is money? We won't either one of us live over ten or twenty years at the most. And we don't need much money. As I have told you, I would just rather live any place, a shack or any place, and be with you. We don't need much money to take care of us the rest of our days. And I don't care about money.' He said, 'I know you don't care about money, Margaret, but I do.' He said,

'Money means everything to me,' and he said, 'I am going to have it.' He said, 'I have told you that I was going to have it, and I am going to. But it won't be long now. Just soon.' And I was in my 'Seventh Heaven.' He had told me to wait to cash the check [in settlement of the last damage action] until the next day. I had wanted to cash it before we went for the ride. So after he told me—Q. This was on February 3rd, 1938? A. Yes."

After February 3, 1938, which was the day of the settlement of respondent's damage actions, followed by the alleged final promise of marriage, the parties saw each other only a few times, and there is no evidence of any illicit relations between them after that date. Respondent's diary was concluded on April 6, 1938, in the following words:

"I still haven't heard from Jay so my diary is ended as it was just about Jay and me. I rented a safety box at Seaboard Bank today and will put Diary in it with other things, as I am not going to start suit against Jay now. I feel it would hurt [naming her son] in business and his home life. . . ."

The parties had no communication with each other during the next two years. In January, 1940, however, respondent's son consulted appellant with regard to an automobile collision in which he, the son, had been involved. At his request, appellant wrote a letter to the other party concerned in that accident. The son called on appellant a number of times with reference to the matter. On the last of these occasions, the appellant complained to the son about certain statements which respondent had been making concerning appellant's law partner. Within a few weeks thereafter, on April 24, 1940, respondent instituted this action.

This completes our statement of the case, but, as indicated above, no attempt has been made to set forth

in detail the specific transactions or intimacies which took place between the parties during either the first or the second period of their relationship. While the record consists for the most part of a recitation and description of the personal experiences growing out of that relationship, we deem it unnecessary as well as inappropriate to give them further emphasis or notice here. We therefore turn to the legal principles involved in the appeal. These are few in number and simple in nature.

It will be noted that a considerable portion of the evidence relates to the conduct and the alleged mutual promises of the parties during the period between 1910 and January 21, 1934, while Laura Allen, the appellant's wife, was still alive. While respondent was required by the trial court, over her objection, to elect upon which specific promise of marriage she would base her action, and while she did elect to rest it upon the alleged promise of February 3, 1938, her argument on the appeal nevertheless stresses the circumstances and events growing out of the relationship existing prior to 1934 and indicates that she still relies, in part, upon the promises alleged to have been made by appellant during the earlier period.

Any attempt, however, to base a right of action upon any promise of marriage made by appellant during the lifetime of Mrs. Allen may be readily dismissed from further consideration. A promise of marriage made by or to a person who, to the knowledge of the parties concerned, then has a spouse living is absolutely void in its inception and cannot give rise to an action for its breach, even though such promise is not to be performed until after the death of, or divorce from, such spouse. Such contracts are in violation of the marital duty and are contrary to morality and public policy. 8 Am. Jur. 848, Breach of Promise of Marriage, § 4;

11 C. J. S. 772, Breach of Marriage Promise, § 2f; accord, *Leaman v. Thompson,* 43 Wash. 579, 86 Pac. 926. We therefore confine our discussion to that period of the relationship subsequent to Mrs. Allen's death.

A right of action for breach of promise of marriage accrues immediately upon breach of such promise, and suit must be brought within the period of limitation prescribed by the statute governing such actions. 11 C. J. S. 784, Breach of Marriage Promise, § 18. But the statute of limitations in such cases begins to run from the time of the breach and not from the time of making the promise. 1 Vernier, American Family Laws (1931) 33, § 8; Keezer, Marriage and Divorce (2d ed. 1923) 28, § 26; 9 C. J. 337, Breach of Marriage Promise, § 26. By the terms of Rem. Rev. Stat. (Sup.), § 159 [P. C. § 8166], a limitation of three years is imposed upon actions for breach of promise, whether such actions be regarded as coming under subsection 3 or subsection 7. Respondent instituted this action on April 24, 1940, and can therefore prevail only if she proves that the appellant breached a promise of marriage at some time subsequent to April 24, 1937.

The most that can be said of any promise alleged to have been made by appellant subsequent to the death of his wife, including particularly the alleged promise of February 3, 1938, is that the appellant promised to marry respondent upon the settlement of his wife's estate, through which he expected to receive considerable money and other property. Respondent's own testimony discloses that appellant's promises were made subject to that condition. While it appears from her evidence that she constantly importuned the appellant to forget about the estate and be content to marry and live with her upon the means which he already had, he was invariably adamant upon that subject, tell-

ing her emphatically that he intended first to get all the money which he was entitled to collect from the pending estate. Hence, there can be no doubt that if, as respondent claims, appellant actually made a promise of marriage on February 3, 1938, or even before, that promise was to be performed only on complete settlement of his wife's estate.

Such settlement, however, has never taken place, and it has never been contended by respondent that the administration of the estate has been unduly delayed merely for the purpose of shielding appellant from liability on his promise. On the contrary, the record discloses that the affairs of the estate, ever since Mrs. Allen's death, have been in such condition that final settlement could not have been required or expected at the time of the commencement of respondent's action for breach of promise.

A promise to marry may be conditioned upon a stated event, so long as that condition is not illegal or contrary to public policy. In 8 Am. Jur. 853, Breach of Promise of Marriage, § 11, it is stated:

"A contract made to marry at a time fixed or on the happening of some event or contingency, is not broken until the time arrives or the event takes place."

In 11 C. J. S. 775, Breach of Marriage Promise, § 7, the rule is given as follows:

"A promise to marry may be conditional, as in the case of a promise to marry conditioned on recovery of health, or on performance of the ceremony in accordance with the observances of a particular church, or on the happening of an event in the future, in which event liability on the promise attaches as soon as the condition is performed, while on the other hand there can be no breach prior thereto."

Appellant of course denies that he ever at any time promised to marry the respondent, but we have ac-

cepted her testimony on that issue, as the jury was entitled to do. But even if a conditional promise was made on February 3, 1938, as respondent claims, or at any time after the death of Mrs. Allen, there is no evidence that appellant ever repudiated such promise or that, prior to the commencement of this action, he informed respondent that he would never marry her.

Respondent relies, however, upon the principle, stated in 11 C. J. S. 777, Breach of Marriage Promise, § 12, that:

"A breach of a contract to marry occurs when there is a failure to perform according to the terms of the agreement, or when one party repudiates his or her promise and disavows an intention to marry the other, even though the time agreed on for the marriage has not yet arrived, notwithstanding the fact that a good and sufficient reason for a postponement of the marriage may exist."

Following the above quotation, the paragraph concludes with this sentence:

"There is no breach, however, until demand for performance and refusal to comply."

In the case at bar, there has been no failure on the part of appellant to perform "according to the terms of the agreement," for any promise he may have made was conditioned upon an event which has not yet taken place. There has been no disavowal by him, prior to the commencement of this suit, of an intention ever to marry respondent. There has been no demand by respondent that appellant perform the agreement regardless of the conditions under which it was made.

Respondent also relies upon the case of *Johnson v. Blomdahl,* 90 Wash. 625, 156 Pac. 561. We there held that the plaintiff's right of action accrued even before the agreed time for the marriage because the defendant had told her that he would never marry her. The

plaintiff's absolute and unqualified disavowal in that case amounted to an anticipatory breach, but since nothing of that nature has ever occurred in this case, the *Blomdahl* case is not controlling here.

One of two alternative conclusions must be adopted with respect to respondent's attitude and status regarding appellant's alleged promise of February 3, 1938, or any other promise subsequent to January 21, 1934. Either she did not believe appellant when he made the promise and did not place any reliance upon it, or, if she did believe him, she accepted the promise subject to the conditions included therein. From what appears in the record, we are convinced that she did not believe that any such promise would be performed, for she had said that she would not believe appellant even under oath, and had accordingly fully expressed her determination to sue him when the time was ripe. If she attached no credit to his promise, then she cannot predicate any action upon it, for a promise, to be binding, must be accepted as well as given. On the other hand, if she did believe appellant and did accept the promise, then she is bound by the terms under which it was made. The time for performance not having arrived, however, and no anticipatory breach having been committed by appellant, respondent may not maintain an action for a breach of the conditional promise.

The judgment is reversed, with direction to the trial court to dismiss the action.

ROBINSON, C. J., MAIN, MILLARD, and DRIVER, JJ., concur.