[No. 28808.  *En Banc.*  March 30, 1943.]

ELSIE I. OPITZ, *Respondent,* v. W. H. HAYDEN, *as Administrator, Appellant.*[1]

[1]Reported in 135 P. (2d) 819.

348

*Hayden, Merritt, Summers & Bucey,* for appellant.
*Chadwick, Chadwick & Mills,* for respondent.

STEINERT, J.—Plaintiff brought suit in the superior court against the administrator of the estate of Spencer E. Anderson, deceased, and in her complaint sought allowance of a creditor's claim which she previously had filed against the estate, but which the administrator had rejected. The claim was based on the decedent's promissory note and on a written contract entered into between the plaintiff and the decedent about seven years prior to the latter's death. The administrator resisted the action in the superior

court on the grounds that the above-mentioned instruments were obtained from the decedent through duress and that they were unsupported by any good or valuable consideration. The cause was tried to the court, without a jury. The court made findings of fact, from which it concluded that plaintiff's claim should be allowed. Judgment was entered accordingly, and the defendant administrator appealed.

While this action is, in form, a suit upon contract, the real issues in the case involve the alleged seduction of the respondent by the decedent, a consequent period of illicit cohabitation between them, and finally a controversy culminating in a written agreement under the terms of which the decedent acknowledged respondent's asserted claims against him and, in settlement thereof, obligated himself to contribute to her support and maintenance during the remainder of her lifetime.

The evidence, comprising over four hundred pages of testimony supplemented by seventy-two written exhibits, is devoted almost exclusively to a portrayal of the relations existing between the respondent and the decedent from September, 1919, to May, 1934, a period of nearly fifteen years. There is no serious dispute as to the facts, but rather as to the inferences and conclusions to be drawn therefrom and as to the law applicable thereto.

Respondent, Elsie I. Opitz, was born in York, Nebraska, in 1900. She was, by many years, the youngest of seven children in the family. Her mother died when respondent was fourteen years old. Three years later, her father, then nearly seventy years of age and a semi-invalid, moved to Seattle, bringing with him the respondent and one of her sisters. A short time thereafter the sister married. About that same time, or probably a little later, another sister, who was

a widow, came with her two children to live with her father, and this family of five thereafter resided together in Seattle until the death of the father in 1924.

After moving to Seattle, respondent obtained employment for a while in a photographic studio and in 1918 took a course in a business college. She then secured a position with an exporting and importing firm, where she remained for six or eight months. She quit that position voluntarily, intending to seek a more desirable one. In September, 1919, an employment agency referred her to the Universal Savings & Loan Association, a financial institution in Seattle, owned or controlled by Spencer E. Anderson, the decedent whose estate is here involved. He at once employed her as a secretary and stenographer, at a salary of seventy-five dollars a month, which was later increased to one hundred dollars a month.

Up to that time respondent had been a girl of unblemished virtue. She came from a Christian family, had attended Sunday school regularly, and was familiar with the teachings of Scripture. She had not had much social contact with men or boys. Although she was seemingly attractive in appearance and personality, she had never attended parties or dances. While living in Nebraska, she associated almost entirely with girl companions and friends of her own family. Her ideal of a happy life was marriage attended with children, and for these she had a normal desire. She had little conception, however, of the significance of sexual relations. She seems to have had the idea that, as between people who were sincerely in love with each other, sexual intercourse was a natural experience, although she had heard of the trouble that it sometimes brought to unmarried persons.

Spencer E. Anderson, her latest employer, was a man then forty years of age, twenty years respondent's senior. He was tall, slender, vivacious, and possessed of a genial disposition. He had been married since 1904 but had no children. He was strong in his propensities toward the female sex and was at that time maintaining a clandestine relationship with a woman acquaintance.

The quarters in which the business of the Universal Savings & Loan Association was conducted were small but had a private office, and respondent was the only hired employee therein. The employer and employee were therefore in close and constant contact with each other.

At first, and for a short time, the relationship between the parties was of the kind normally existing in a business office where the employer is affable and pleasant, and the employee efficient and agreeable. Occasional jokes and witticisms by him kept her in a happy frame of mind. She knew, however, that he was married. As time went on, his attentions toward her became more personal. He began writing her "little love notes" and addressing her in affectionate terms. Frequently, a stay after office hours resulted in his embracing and kissing her. Then followed suggestions by him for evening appointments for dinners, automobile rides, and shows. At his solicitation, she began to accept the invitations.

Interwoven in these advances by Anderson were his divulgences to respondent of facts concerning his marital life. He confided to her from time to time that morally he had divorced himself from his wife years ago; that, though living together, he and his wife were going their separate ways, having no mutual interest in each other. He dwelt upon the fact that he had no children, which were his soul's desire, and that

he longed to be married to a woman who would give him babies. In time, he began professing his great love for respondent, characterizing her as the girl of his dreams. He announced his firm intention to divorce his wife and his yearning to marry the respondent as soon as his marital status and certain financial conditions would permit. He also confessed that because of his present home life he was carrying on a meretricious relation with a woman who was not his wife, but avowed that because of his great love for respondent he could no longer think of keeping up this association with the other woman. He further expressed his fixed belief in trial marriage as the basis for a contented and happy married life.

In the course of these conversations, Anderson also told respondent that in time he was expecting from his father a large inheritance, explaining that, through an original investment of five thousand dollars in stock of the Ford Motor Company, his father had realized a fortune of thirteen million dollars. It appears that his representations in that matter were at least to some extent true, although the record does not disclose the amount or value of his father's estate or how much thereof was in time actually received by Anderson.

These attentions on the part of Anderson kept up steadily for several months and finally led to suggestions and importunities by him for sexual intercourse with respondent, on the representation that it would be the true test of their love for each other. He painted the experience as a trial marriage, to be followed ultimately with real marriage after he had obtained a divorce from his wife.

In consequence of the attentions showered upon her by Anderson, respondent fell deeply in love with

him, but for a while she resisted his suggestions for sexual intercourse. Finally, however, one evening in March, 1920, in his private office, she succumbed to his efforts and surrendered her virtue and virginity to him. That was the beginning of a continuous sexual relationship, lasting for years and interrupted only by periods when the two were temporarily separated from each other. Throughout the entire relationship, Anderson always protested his undying love and loyalty to respondent and, as evidenced by his many letters, made part of the record, kept constantly telling her that he was going to divorce his wife just as soon as his financial condition would permit.

About a year after the first act of sexual intercourse, respondent became pregnant and, two months thereafter, at the insistence of Anderson, who made the necessary medical arrangements, she submitted to an abortion. The operation was performed at eleven o'clock in the forenoon of a certain day, and at noon of the same day she met Anderson downtown in Seattle and was taken by him to a hotel. Later in the afternoon, he drove her to the vicinity of her home, and she went the rest of the way on foot. The next day she reported for work and continued to do so regularly thereafter. This course of procedure was adopted in order that her family might not learn of her predicament. Respondent testified that as a consequence of that experience her health sustained an impairment from which she has never fully recovered. However, the relations between her and Anderson were resumed and continued as before.

In 1923, at the order of the state authorities, the financial institution operated by Anderson was merged with a larger savings and loan association, and re-

spondent, being compelled to seek other employment, immediately secured a position with a substantial business concern in Seattle. Anderson, however, objected strenuously to her working and insisted that she quit. He declared that he could not bear to have her take dictation from any other man, and reiterated his determination to marry her as soon as the law and his finances would permit. In compliance with his importunities, she gave up her position, and Anderson continued to pay her the sum of one hundred dollars a month, which had been her salary while working for him. The relations between them continued as before.

In 1924, respondent's father died, and she accompanied the body to Nebraska for burial. While she was there, Anderson bombarded her with letters and telegrams in which he pleaded with her to meet him in Denver, Colorado. She acceded to his request, and during their stay in that city they participated in their usual sexual relations.

At the request of respondent and her sisters, Anderson was appointed administrator of their father's estate. In the final settlement and distribution thereof, respondent received an inheritance of four hundred dollars. This amount she loaned to Anderson, taking his note therefor. The note has been renewed from time to time, over the course of years, but has never been paid.

Sometime in 1924, Anderson made known to respondent's sisters his meretricious relations with her and also told them of his plans to divorce his wife and marry the respondent. The sisters did not react favorably to this information and severely criticized her. In consequence of their subsequent treatment of her, and at Anderson's suggestion, respondent left her home permanently and thereafter lived alone.

Anderson continued to pay her a monthly allowance of one hundred dollars, and their relations continued unabated. Frequently, they resorted to hotel rooms, where he would register the parties as man and wife.

In 1926, respondent moved to Portland and worked there for almost a year in the office of a certified public accountant. During that period, Anderson corresponded with her regularly and visited her frequently. In fact, his attentions upon her were so pronounced that they interfered with her work, and she was fearful of losing her position. He finally induced her to return to Seattle, where she remained until 1931. During that four-year period in Seattle, she held a number of positions with various concerns, but each employment was of short duration. She was continually annoyed by Anderson, who insisted that she give up her employment and live on the allowance which he was willing to provide for her. As long as she would refrain from working, he paid her regularly one hundred dollars a month, but whenever she took employment his contributions would cease, though his attentions continued.

Anderson's father died in 1929, and the son went to Wisconsin to attend the funeral. He requested respondent to accompany him so that she might meet and become acquainted with the members of his family there. She went as far as Nebraska, where her relatives resided, and was prepared to go on to Wisconsin, but for some reason Anderson changed his plans with respect to having her come there. Instead, she met him in Chicago and then returned with him to Seattle. The trip was attended with sexual indulgences.

During all this time, Anderson was constantly telling respondent his plans for securing an early di-

vorce and marrying respondent. Now that his father was dead, he had every prospect of receiving his inheritance soon. Thus fortified, he intended to make a settlement with his wife and proceed with the divorce. Up to that time, he had been fearful that if he took such steps he would meet his father's displeasure and be cut off from his expected inheritance. The estate was not settled, however, until some time in 1931, and an unexplained misunderstanding between the decedent and one of his brothers, who was an attorney, further complicated matters. Although handicapped in these respects, Anderson kept up his established relationship with respondent.

The evidence discloses that, during the years that Anderson paid respondent a specific monthly allowance, she was able by careful management to live on a lesser amount. What she thus succeeded in saving she put in a bank. Whenever making trips to meet Anderson, she would draw on these funds, upon his promise to repay them. Over the course of years prior to 1934, these expenditures by her amounted in all to $950, and he in compliance with their understanding gave her two notes, one in the sum of $400 and the other $550. These notes were renewed from time to time and finally were consolidated, together with the $400 note given in 1924, into a single note in the sum of $1,350. That note constitutes a part of respondent's claim in this action.

In April, 1931, respondent concluded to leave Seattle and go to San Francisco. It seems that she was trying to break away from Anderson, partly because she sensed that he did not intend to carry out his plans for a divorce, but particularly because she was broken in mind and body on account of the life she was living and the demands that he was constantly making upon

her. She was deeply in love with him, however, for, as she expressed it, "He was all that I had." When she left Seattle, she took all her belongings with her. Anderson agreed to her going, but told her that he would leave for Reno at an early date and would have her join him there. While she was in San Francisco, he sent her monthly remittances of one hundred dollars and corresponded with her regularly.

In August, 1931, Anderson urgently requested respondent to come back to Seattle. As appears by one of his letters, he induced her to return, under a promise to provide her with an apartment and pay her fifteen dollars a week besides. He told her that he would not insist upon her remaining in Seattle longer than January 15th of the following year unless she desired to stay indefinitely. He was certain that within that period of time all matters pertaining to his inheritance would be settled, thus enabling him to proceed with his plans for divorce. He also told her that, if matters should not be satisfactorily completed by that time, he would pay her tuition at a commercial school so that she might prepare herself to reenter the business world, and, further, pay her return transportation and freight to California.

Respondent accepted the offer and returned to Seattle, bringing her possessions with her. While in Seattle, she was provided for by Anderson as he had agreed, and their sexual relations were resumed. During this time, he constantly told her of his expectations and plans concerning his finances and intended divorce. However, by Thanksgiving of that year, 1931, it became evident to respondent that Anderson's plans would not materialize as had been expected. She therefore decided to return to California. They then agreed that she should locate in Los Angeles, and

that later he would go to Reno and establish a residence for the purpose of procuring a divorce. : ·

In January or February, 1932, Anderson visited respondent in Los Angeles, where sexual relations were resumed. He represented to her at that time that he was then on his way to Palm Springs to meet his brother and complete certain financial arrangements whereby he might go ahead with the contemplated divorce proceedings.

About this time, however, respondent suspected and became convinced that Anderson was unable to procreate. This, in her opinion, would render a marriage to him a futility. The record discloses that the subject had been frequently discussed between them in conversation and correspondence as well. In fact, it appears that for sometime Anderson had been taking genito-urinary treatments, under the supervision of a well-known, reputable physician in Seattle.

About the middle of 1932, Anderson took up a temporary residence in San Francisco, living at a hotel. Respondent wrote to him there, telling him that she had finally decided not to marry him. Anderson became panic-stricken, threatened suicide, and pleaded with her by letters and telegrams to agree again to marry him just as soon as he should obtain a divorce, for which he was then making preparation. She relented and agreed to become his wife, even though they could not have children.

Capitalizing upon her promise, Anderson had respondent come to San Franciso and take what he termed a "pre-honeymoon trip." They traveled to various points in California, including Yosemite National Park, on that kind of journey. Later in the same year, and for the same purpose, she met him in Ogden, Utah, while he was en route east to attend to some business matters. During all the time that re-

spondent was in Los Angeles, Anderson constantly wrote to her, professing his great love for her and emphasizing his plans for an early divorce from his wife. His letters, which are in the record, portray more vividly than we can describe his assurances to her. There can be no question that Anderson, though married, had long since been estranged from his wife and was fully determined to divorce her at the opportune time. The only thing, apparently, that stood in the way was the fact that he had not yet received the benefit of his expected inheritance, by means of which he intended to make a satisfactory settlement with his wife. Throughout this entire period, however, he was sending to respondent regularly one hundred dollars a month for her maintenance. She was not working while in California, for the reason that her marriage to Anderson was understood to be but a matter of time.

Sometime near the middle of 1932, Anderson did actually establish his residence in Reno for the purpose of procuring a divorce. He thereupon requested respondent to come to that city and remain with him during the waiting period. She did not go, however, but remained in Los Angeles.

On January 18, 1933, Anderson obtained a decree of divorce from his wife. Astounding as it may seem, in view of what has heretofore been narrated, the record discloses that, on January 21, 1933, three days after obtaining the divorce, Anderson married one Donna Williamson, whom he had met at the hotel where he was staying while in San Francisco. Respondent had never heard of this woman, nor had Anderson ever mentioned to respondent his acquaintanceship with her. Anderson did not inform respondent that his divorce had been granted or that

he had married Donna Williamson. To the contrary, his subsequent letters indicated that his divorce action was still pending.

In March, 1933, two months after his second marriage, a divorce proceeding was instituted by Anderson against his second wife, or by her against him. During this same period, Anderson continued to write to respondent, mentioning the divorce proceeding then pending, but leading her to believe that it was the proceeding between himself and his first wife. All this time, Anderson was sending respondent one hundred dollars a month for her maintenance.

In June, 1933, Anderson, being then separated from his second wife, took a trip alone to South America. He stopped on his way at Los Angeles and resumed sexual relations with respondent. The record does not disclose what, if anything, he then told respondent about his divorce from his first wife, or what plans he proposed for marriage to respondent. It is certain, however, that respondent knew nothing of what had actually transpired between Anderson and either his first or second wife during the period between January, 1932, and June, 1933. It is also clear that during that same period he was making his monthly contributions to respondent regularly.

During his trip to South America, Anderson kept up his correspondence with respondent, avowing his affection for her. According to these letters, however, he appears to have recognized the fact that he and respondent would never marry, although he told her that he had made provision for her in his will, and that she would always be assured of an income of from one hundred to one hundred fifty dollars a month. The record does not disclose that he ever made such provision for her by will.

On his return from South America, Anderson resumed a marital status with the woman who had been his second wife. It is not clear from the evidence whether he had finally divorced her in March and later remarried her, or whether the divorce proceedings between them had in the meantime merely lain dormant. It appears from the record, however, that in the early part of 1934 divorce proceedings were either instituted, or else revived, as between them. Be that as it may, respondent knew nothing about this state of affairs until sometime in February, 1934, when the second Mrs. Anderson called on her in Los Angeles and divulged the situation to her. The second wife was evidently seeking to procure evidence against Anderson, for she succeeded in obtaining from respondent certain of his letters to her, of which the second wife had photostatic copies made.

Astounded by the revelation conveyed to her by the second wife, respondent immediately consulted a firm of attorneys in Los Angeles, telling them the whole story of her experience with Anderson and submitting to them a great number of his letters, which are now a part of the record herein. She was advised by her attorneys that she had a good cause of action against Anderson for seduction and for other wrongs committed against her. She was further advised to go to Reno, where Anderson was then sojourning, and demand a settlement. Names were given to her of attorneys in the city of Reno whom she should consult.

Respondent then went to Reno to see Anderson, and a stormy session ensued. Anderson confessed his affairs with Donna Williamson and acknowledged the wrong he had done to respondent. It appears that the second Mrs. Anderson was in Reno at the same time,

and the record indicates that she and Anderson were occupying the same apartment while their divorce proceeding was in progress. At any rate, respondent and Anderson, together with his second wife, met and discussed the existing situation. Respondent and Anderson alone also had a number of conferences with each other.

Respondent thereupon procured counsel in Reno and was again advised that she had a good cause of action against Anderson for the wrongs he had committed against her. Anderson had separate counsel of his own. As a result of several conferences, a written agreement was finally prepared by counsel, and, on May 8, 1934, in the presence of their respective attorneys, it was signed by both Anderson and respondent. That agreement is the one on which this action is principally founded.

The written instrument recited, first, that the second party (the respondent herein) had certain claims against the first party (Anderson) which the latter acknowledged and for which he desired to contribute to her support and maintenance throughout her lifetime, and that the second party was willing to accept the sums therein stipulated, in full satisfaction of her claims, so long as the terms of the agreement should be fulfilled.

The agreement then provided that Anderson should pay respondent the sum of one hundred dollars a month during her lifetime, and that she should, in turn, release him from all claims against him, except as to three notes aggregating $1,350, to which reference has already been made. The agreement further provided that nothing therein contained should prevent her receiving and collecting the proceeds of any bequest which he might provide for her in his last

will and testament. In conclusion, the agreement provided that it should be binding upon the heirs, executors, administrators, and assigns of both parties.

From the day of the execution of that agreement until some time in October, 1940, a period of six years, the parties did not see each other. During that period, however, Anderson paid to respondent regularly, from May 8, 1934, to August 8, 1940, the sum of one hundred dollars a month, according to the terms of their agreement. In May, 1940, he sent her a check for $850 to apply on the $1,350 note which represented the total amount of the three notes above mentioned. That check, however, was later protested for nonpayment and has never been paid.

In October, 1940, respondent instituted an action against Anderson in the municipal court in Los Angeles to recover two unpaid installments due under the above agreement and for recovery upon the dishonored check. Anderson, who was then living in San Francisco, appeared in the action. The parties thereafter held a number of conferences in Los Angeles, their respective counsel also being present. In the early part of February, 1941, a contract was prepared, purporting to compromise and settle all claims and disputes growing out of the former agreement of May, 8, 1934. By the terms of this later contract, Anderson was to execute in favor of respondent a note for $13,-600, payable in monthly installments of one hundred dollars, also a note for $800 due in six months, and to pay cash in the sum of $1,050 on the execution of the agreement. Respondent, in turn, was to dismiss the action then pending, cancel the $1,350 note, and surrender the dishonored check for $850. The new agreement was to take the place of the one executed May 8, 1934. After the new agreement was

prepared, it was sent to Anderson at San Francisco with the request by his attorneys that he sign and return it immediately. Receiving no response from Anderson, his attorneys wired to San Francisco and learned that their client had died suddenly a few nights before. So far as the record discloses, the new agreement was never signed by Anderson.

Probate proceedings were subsequently instituted in Seattle upon Anderson's estate. Respondent filed her claim against the estate, basing it upon the $1,350 note and the agreement of May 8, 1934, under which she was to receive from Anderson the sum of one hundred dollars a month for the rest of her life. The claim was rejected by the administrator, and the present action was thereupon instituted.

Appellant sets forth in his brief forty-five assignments of error alleged to have been committed by the trial court, and in his statement of questions involved lists ten propositions. The legal questions presented are, however, but few in number and, in fact, may all be reduced to the one general question of whether there was any valid consideration for the notes and the agreement upon which respondent seeks recovery.

It may be noted, at the outset, that this is not an action for breach of promise, nor is it of itself a statutory action for seduction. It is an action based upon a written agreement for the payment of specified sums of money in compromise and settlement of claims theretofore asserted by respondent and acknowledged by the decedent, such claims arising out of a sexual relationship alleged to have commenced with the seduction of the respondent, maintained thereafter until pregnancy resulted, followed by abortion and consequent physical damage to respondent, and then pro-

tracted over a period of years of illicit intercourse, all claimed to have been induced by constant protestations and manifestations of love by the decedent and by avowals of his intention to divorce his estranged wife and marry the respondent.

Appellant begins his discussion of the subject in controversy with the statement that there was no good or valuable consideration for the alleged contract, *unless* it was for seduction. He then takes the position that there was no seduction in fact; that, on the contrary, respondent and Anderson were both evilminded and guilty of adultery; and that adultery, being a crime, furnishes no consideration for the compromise of a claim based thereon.

Seduction is the act of inducing a woman of previously chaste character to consent to unlawful sexual intercourse, brought about by enticement, persuasion, or promise of marriage on the part of the person charged with the act. *State v. Reinikka,* 128 Wash. 399, 222 Pac. 885; 2 Cooley, Torts (4th ed) 39, § 172; 24 R. C. L. 731, Seduction, § 2; 57 C. J. 9, Seduction, § 1; 38 Words & Phrases (Perm. ed.) 490 *et seq.*

Every element of seduction, as thus defined, is present in this case. On that question, the situation must be viewed not from the standpoint of the culmination of the relationship between the parties, but rather from the standpoint of the conditions that prevailed when the seductive influence began and of the means by which the result was accomplished. If it was seduction at the time of its accomplishment, its character was not changed by the fact that it was followed by years of illicit sexual intercourse. Instead of mitigating the initial offense, the subsequent illicit cohabitation rather aggravated the initial wrong, under the circumstances shown here.

Respondent, a girl twenty years of age, was of previously chaste character. Her association with men had been limited, and she was ignorant of the wiles employed when seduction is the goal sought. Though a woman in appearance and physical equipment, she was but a child in knowledge of sexual affairs. She was a target without armor, a quarry to a primitive, relentless pursuit. Anderson was twenty years her senior. He was her employer, in command of her time and attention throughout the day. He was in a position to determine the character of the atmosphere about the office; she was expected to adjust herself to the conditions. His approach to her was sinuous and subtle, one calculated to disarm rather than to forewarn. An easy amiability prepared the way for more artful designs, imperceptibly wrought but deftly executed. Gradually he awoke in her an affection for him which with his encouragement flamed into an infatuation, making her an easy prey to his devised enticements.

Through his expressions of endearment, his manifestations of affection, his invitations to dinner and theaters, his appeal to her sympathy because of his unhappy married life and his longing for the "girl of his dreams," his artful characterization of trial marriage as being the basis for a substantial, happy wedded state, his importunities for sexual intercourse, and his overtures of ultimate marriage, he broke down her defense and brought her to the point where, unable to resist him further, she surrendered her chastity. The promises of marriage were, of course, unenforcible and, alone, would not afford any ground of action, but nevertheless they did constitute a part of the artifices employed by him to achieve his dominion over her. But whether or not the promise of marriage be considered, we have no hesitancy in saying that by his solicitation, enticement, and persuasion the decedent seduced the respondent.

Appellant next contends that the affair between respondent and the decedent was, in its final analysis, simply a bargain between two people who were in love with each other, wherein the woman consented to a trial marriage, which she well knew meant sexual intercourse, and the man in turn promised to marry her as soon as he was financially able and after he had secured a divorce from his wife.

Undoubtedly, respondent and the decedent were in love with each other. But there was no *bargain* between them, either express or implied. To the contrary, it was, as we have already indicated, simply a case of seduction, wherein a girl of previously chaste character was induced to consent to unlawful sexual intercourse, brought about by the blandishment, wiles, enticement, and persuasion exerted upon her by the seducer. Throughout this phase of his argument, appellant stresses the invalidity of the promise of marriage, as though the case must stand or fall upon that issue. But a promise of marriage is not an indispensable element of seduction. *State v. O'Hare*, 36 Wash. 516, 79 Pac. 39, 104 Am. St. 970, 68 L. R. A. 107; *State v. Storrs*, 112 Wash. 675, 192 Pac. 984, 197 Pac. 17; 24 R. C. L. 736, Seduction, § 6; 57 C. J. 50, Seduction, § 156. The essential element of the offense is the seduction itself, when brought about by solicitation, persuasion, or any artifice by reason of which a woman of previously chaste character is induced to depart from the path of rectitude and yield to sexual intercourse.

The promise to marry was not the sole, nor even the principal, inducement by which respondent was led to her surrender, but even if it was, it still was one of the elements of enticement by which the decedent accomplished his purpose. While it could not be made a ground for an action for breach of promise, it is a

fact to be considered in determining whether respondent was seduced.

Appellant next contends that there was no valid consideration for the contract of May 8, 1934, because (1) there was no certain or even doubtful claim to be compromised, and (2) the statute of limitations had run against the alleged consideration. This contention presents the crux of the dispute between the parties.

If, at the time of the execution of the contract, respondent had no existing legal claim against Anderson, then the assurances made by him in the written agreement would amount simply to an executory promise on his part, and the question would arise as to whether such promise could in any event be enforced. It has become well established by an almost unanimous current of modern authority that a mere moral obligation or conscientious duty arising solely from ethical motives or the promptings of conscience, unconnected with any legal obligation or with the receipt of material benefits to the promisor, will not furnish a consideration for an executory promise, and this rule has been very emphatically applied to promises made wholly on account of past cohabitation where no element of consideration other than moral is present. But it is equally well established that moral obligations arising from, or connected with, what was once a legal liability which has since become suspended or barred by the operation of a positive rule of law will furnish a consideration for a subsequent executory promise.

These rules, which are corollary to each other, have been set forth virtually as above stated, and the authorities in support thereof collated, in 12 Am. Jur. 590 *et seq.*, Contracts, §§ 97, 98, 99, and in an annotation appearing in 17 A. L. R. 1229, particularly on

pages 1302, 1311, 1317, and 1333. See, also, 17 C. J. S. pp. 470, 471, 472, Contracts, §§ 116, 118, 123. Although this court seemingly has never stated these rules in the language employed above, our decisions are entirely in accord therewith. See *Irons Inv. Co. v. Richardson*, 184 Wash. 118, 50 P. (2d) 42, and numerous cases therein cited.

Since, as we have above declared, the facts in this case establish seduction by the decedent, respondent had a good cause of action against him, at least within three years after the commission of the initial offense. Rem. Rev. Stat., § 186 [P. C. § 8266], specifically provides that an unmarried female, as plaintiff, may maintain an action for her own seduction. Therefore, under the rules above stated, the claim which respondent originally had for her seduction by decedent furnished a valid consideration for what may have been merely an executory promise of compensation by the decedent, even though her claim for seduction may have been barred by the statute of limitations. In this connection, it might also be forcefully argued that in such claim for seduction the respondent would be permitted to include, as an element of damage, the debauchery to which she was subjected by reason of the original transgression, although it is not necessary for us to go that far in this case.

The two grounds of appellant's final contention, as stated above, present the question whether the contract here involved is validly founded upon a compromise. The general rule with respect to settlements made in good faith, for the purpose of adjusting and placing beyond dispute the rights and claims of the respective parties to the settlement, was stated in *Hutchinson v. Mt. Vernon Water & Power Co.*, 49 Wash. 469, 95 Pac. 1023, by quotation from 8 Cyc. 505 *et seq.*, as follows:

"The rule is well settled that an agreement of compromise is supported by a sufficient consideration where it is in settlement of a claim which is unliquidated, where it is in settlement of a claim which is disputed, or where it is in settlement of a claim which is doubtful. There are cases to the effect that in order to support a compromise in avoidance of litigation the claim must be an actual one, founded upon a colorable right about which there is room for honest doubt and actual dispute, and with some legal or equitable foundation, and not one which is without foundation, and is known to be so, or is in its nature an illegal claim out of which no cause of action can arise in favor of the person asserting it. The usual test, however, as to whether a compromise and settlement is supported by a sufficient consideration is held to be not whether the matter in dispute was really doubtful, but whether or not the parties *bona fide* considered it so, and that the compromise of a disputed claim made *bona fide* is upon a sufficient consideration, without regard to whether the claim be in suit or not. The law favors the avoidance or settlement of litigation, and compromise in good faith for such purposes will be sustained as based upon a sufficient consideration, without regard to the merits of the controversy or the character or validity of the claims of the parties, and even though a subsequent judicial decision may show the rights of the parties to have been different from what they at the time supposed. The real consideration which each party receives under such a compromise is, according to some authorities, not the sacrifice of the right, but the settlement of the dispute."

The rule adopted in the *Hutchinson* case, *supra*, was followed in *Johnson v. Savage,* 163 Wash. 478, 1 P. (2d) 890, and the quotation from 8 Cyc. 505 was again set forth at length. The *Johnson* case also made quotation from 12 C. J. 324, as follows:

"The settlement of a *bona fide* dispute or a doubtful claim, if made fairly and in good faith, is a sufficient consideration for a compromise based thereon. This

rule is generally accepted, although there is some variance of authority as to what may constitute a *bona fide* dispute or doubtful claim. The real consideration which each party receives is, according to some authorities, not the sacrifice of the right, but the settlement of the dispute. Under other authorities it is to be found in the mutual agreement of the parties to abide by the result of the settlement, or in the mutual release of their respective rights, or in the avoidance of the expense and annoyance of litigation, or in the alteration in the position of the parties."

Other cases from this jurisdiction in accord with the principles above stated are: *Snohomish River Boom Co. v. Great Northern R. Co.,* 57 Wash. 693, 107 Pac. 848; *Johnson v. Savage,* 163 Wash. 478, 1 P. (2d) 890; *Jones v. Reese,* 191 Wash. 16, 70 P. (2d) 811; *Sweeny v. Sweeny Inv. Co.,* 199 Wash. 135, 90 P. (2d) 716, 139 A. L. R. 847. See, also, *Hoyt v. Wickham,* 25 F. (2d) 777; 11 Am. Jur. 249, 253, Compromise and Settlement, §§ 4, 7; 12 Am. Jur. 581, Contracts, § 87; 15 C. J. S. 728, Compromise and Settlement, § 11.

In the instant case, the facts as found by the trial court and abundantly supported by the evidence, meet every requirement and more than satisfy every principle laid down in the foregoing textual quotations. Respondent was seduced by the decedent. Undoubtedly in consequence thereof, she continued her relations with him during her early womanhood. She suffered the consequences of pregnancy; she has given the best years of her life, as well as her love, to him, foregoing the opportunities of meeting and marrying one who would give her support and respect. She loaned him funds of her own inheritance. She later loaned him moneys which he had given her and which became her sole property. She relied implicitly, though without the sanction of the law, upon his repeated promises and affirmations that he would marry her as

soon as he had divorced the wife from whom he was already estranged. She was subjected to the humiliation of being discarded at a time when he might have fulfilled his promise, but instead married another woman. On advice of counsel, she concluded that she had a good cause of action. Every lawyer who dealt with the contract, whether before or after its execution, evidently thought that she had a valid cause for complaint. The decedent himself thought so, for over his own signature he acknowledged her claim against him and agreed to make reparation therefor. Had the decedent lived but a few days longer, there is every reason to believe that he would have executed the agreement converting the monthly payments into a lump sum. The trial judge in the present action stated emphatically that in his opinion respondent had a good cause of action against the decedent. While her claim may not have been indisputable or legally certain, it had at least the standing and merit of what is termed in law as a "doubtful claim," sufficient to constitute the basis for compromise and settlement. The parties to the agreement were making an honest attempt to settle a claim which was actual in part and at least colorable as to the rest. The evidence makes it clear that the settlement was for all past wrongs inflicted by the decedent upon the respondent. The agreement contained no stipulation for future illicit cohabitation, and it is not claimed that the parties ever had sexual intercourse with each other after the date of the contract. We are convinced beyond question, and therefore hold, that there was valid and sufficient consideration to support the agreement of compromise.

　■ With reference to appellant's contention that the statute of limitations had run against any claim which respondent might have had for seduction, it is sufficient to say that, while the statute may have barred

an action for damages on that score, it did not *extinguish* the claim nor render it insufficient to support a subsequent promise to compensate for the wrong done. The statute runs against the remedy only, not against the right. *In re Smith's Estate,* 179 Wash. 417, 38 P. (2d) 244; 34 Am. Jur. 20, Limitation of Actions, § 11; 37 C. J. 698, Limitation of Actions, § 18.

■ A part of respondent's claim was based upon the notes above mentioned. One of them, it will be recalled, was for moneys which she had received from her father's estate and thereafter loaned to the decedent. There can be no question whatever concerning the consideration for that note. The other notes represented moneys which respondent originally received from the decedent and at his request used for expenses which he agreed to defray and for which he executed his notes in equivalent amounts, including accrued interest. When the decedent gave respondent the money originally, it became her property, and the subsequent transactions constituted loans of her money to him. Under the authorities above cited, such promises to repay are not illegal nor unsupported by valid consideration.

The judgment is affirmed.

SIMPSON, C. J., BLAKE, ROBINSON, JEFFERS, and GRADY, JJ., concur.

MILLARD, J. (dissenting)—The right of action for recovery for alleged seduction of March, 1920, was long since barred by the three-year statute of limitations (Rem. Rev. Stat., § 159 [P. C. § 8166]) when the contract of May 8, 1934, was executed; hence, there was no valid consideration for the contract. In *Gates v. Shaffer,* 72 Wash. 451, 130 Pac. 896, we held that the statute of limitations begins to run against a female's right to maintain an action for her own seduction from

the time she arrives at the age of twenty-one years. Respondent claims she was seduced in 1920 when she was twenty years old. The statute commenced to run in 1921 and the action was barred in 1924, three years later.

There certainly was not any seduction after 1924. Respondent discontinued intercourse with Anderson in 1926 and went to Portland, but later resumed illicit relationship with him. Whether the three-year statute runs from 1924 or 1926 is not important, as the contract was executed ten years after the tort of 1920 was barred in 1924, and eight years after discontinuance of relations in 1926.

A promise or a contract to pay a claim contrary to public morals is unenforcible. An agreement or contract to compromise, rather than to litigate, a claim which is contrary to public morals is on the same plane, and for the same reason is not enforcible. The promisor may disregard such promise.

A contract to pay will not remove the bar of the statute of limitations after the statute has run against an action in tort. An action for tort, once barred by the statute of limitations, cannot, like an action arising out of contract, be revived either by an express or implied agreement. The announced reason for the rule is that, while in cases of *assumpsit* an acknowledgment amounts to a new promise, it would be absurd to hold that in cases of tort an acknowledgment amounted to a new tort. *Nelson v. Petterson*, 229 Ill. 240, 82 N. E. 229, 11 Am. & Eng. 178, annotation, 180, 13 L. R. A. (N.S.) 912, annotation, 914.

If the consideration for the contract was the past illicit relationship continued from 1920 to 1933 (for which services respondent regularly each month received cash payment from Anderson), in the hope or

on the promise of Anderson's divorce from his first wife and his marriage thereafter to respondent—those are the facts—the contract is void, as it is in violation of the marital duty, and is contrary to morals and public policy. *Jones v. Allen,* 14 Wn. (2d) 111, 127 P. (2d) 265. See, also, 13 C. J. 461; Williston on Contracts (Rev. ed.), § 148; and *Olson v. Saxton,* 86 Ore. 670, 169 Pac. 119.

"So it is held that a promise to pay a woman on account of cohabitation which has ceased, even though the defendant has seduced the plaintiff; . . . is invalid." Williston on Contracts (Rev. ed.), § 148.

That the contract of May 8, 1934, was obtained and induced by oral threats in April and May, 1934, cannot be gainsaid. Anderson's lawyer and respondent's lawyer conferred respecting her demand for a settlement. The only reasonable inference deducible from the execution of the alleged contract of May 8, 1934, was that Anderson, in consideration of respondent's forbearing prosecution of the action—an agreement on the part of respondent to forbear to do an act which she had no legal right to do—promised to pay respondent as alleged by her. Her agreement to forbear instituting and maintaining the action could not constitute a sufficient consideration for the promise of Anderson. To constitute forbearance a good consideration for a promise, there must be a legal right forborne; for, if the claim is illegal, forbearance is worthless. Annotation, 25 L. R. A. (N.S.) 303.

It is true that the law favors the amicable settlement of claims. It should be borne in mind, however, that compromise is an agreement; and, if the consideration for that agreement is void, the courts will not lend their aid in enforcement of the contract.

*Hutchinson v. Mt. Vernon Water & Power Co.,* 49 Wash. 469, 95 Pac. 1023, cited to sustain the majority

opinion, involved the compromise of a water right controversy and was not in the nature of an illegal claim out of which no cause of action can arise in favor of the person asserting it. Our conclusion in the case cited had to do only with the claim which did not involve moral turpitude. The authority cited is not in point. There is a distinction between the compromise of a claim respecting property and the compromise of a claim involving moral turpitude of fundamentally illegal contracts. In the note to *Armijo v. Henry,* 14 N. M. 181, 89 Pac. 305, 25 L. R. A. (N.S.) 275, 310, the rule is stated respecting the effect of the compromise of property claims and the following statement is then made:

" . . . provided, always, the contract is not illegal and void because violative of a statute or contrary to public policy. Examples of such illegality are compromises and settlements of gambling debts, and claims arising out of illicit trade in intoxicating liquors. The extreme case of an illegal and void compromise is an agreement to compound a felony. It is so universally and with such unanimity admitted that such contracts, in every possible guise, are absolutely void, *ab initio ad finem,* that to cite cases in point would be mere affectation of learning."

A compromise, like other contracts, requires, among other things, a consideration. 11 Am. Jur. 248, § 3.

"Like all other contracts, a compromise must be supported by a consideration. Moreover, the consideration for a compromise must not be against public policy." 11 Am. Jur. 264, § 18.

We agree with counsel for respondent, and the citation of sustaining authority (11 Am. Jur. 249, § 4), that to prevent the compromise of claims by compelling adjustments of all controversies by litigation in court, is against public policy. We have already stated the distinction between the compromise of a claim in-

volving moral turpitude and the compromise of a claim regarding property.

While there is no legal inhibition against paramours making agreements with each other—such as the payment of one's paramour for her services as housekeeper—an agreement like the one in the case at bar is so infected by the illegality of the relationship and the consideration of that contract or compromise being against public policy, the contract is void. 15 C. J. S. 727, § 10, p. 760, § 38; annotation, 17 A. L. R. 1311; *In re Greene*, 45 F. (2d) 428; *Locke v. Pembroke*, 280 N. Y. 430, 21 N. E. (2d) 495.

I concede that Anderson was a roue and that, morally, none could be baser than he. I am convinced by my examination of the record—especially the sadistic, filthy sex letters of respondent to her lover, to whom she could not make her favors legal while he was married to another—that I would be exceptionally credulous, or as pure of thought and action and as chivalrous as the Knights of the Round Table were reputed to be, if I believed that respondent was a simple village maiden who surrendered her honor to Anderson. She was aware of the social jeopardy and physical risk attendant on sexual congress with a man who admitted to her that he was a libertine and had another paramour when he initiated his campaign to storm the citadel of virtue. Admittedly, she was conscious of the fact that such illicit relationship constituted a breach of the moral code.

If she was a child in sexual affairs in 1919, she manifested exceptional precocity or cunning in withstanding for six or seven months the importunities of Anderson until she obtained from him a promise that as soon as he was financially able he would procure a divorce—a covenant of adultry—from his wife and

marry respondent, and retained his letters for future use as evidence, although she neglected to keep a daily diary of their libidinous conduct. If she had a virtuous mind—she had religious training, was not mentally weak and, doubtless, was endowed by the Creator with a conscience as well as with complementary attractions of her sex—it would have ever been, as the author Harrison writes, "attended by a strong siding champion, conscience."

She was not a target without armor. Propinquity of the sexes, one a libertine forty years old, cannot excuse the other's (a twenty-year old virgin mentally, morally, and physically equipped as was respondent) interference with the marital relation of the male even on the plea that their mutual love sanctioned, sanctified their meretricious relationship. Conceding, solely for the sake of argument, that she was the pursued and not the pursuer for the period of six or seven months prior to her alleged seduction, the record is clear that thereafter she was as possessive and as amorous as he in this ill-starred romance. Without armor? She had an invulnerable wall of defense: she possessed a conscience, a sense of right, but its still small voice she would not heed. Her conscience (the strongest of all champions), had she permitted, would have been victorious in the contest for the citadel which underwent a siege for only six or seven months before it was breached.

Inexcusable illicit pleasure, the evil bait by which admittedly respondent was caught as fish by a hook, can have no fellowship with virtue; it could not have dulled or blinded her mental vision sufficiently long to have enabled the roue to have breached the citadel had she not given her conscience a vacation. The vice of illicit intercourse could not attain the rank of virtue

simply because respondent deemed mutual love of the paramours sanctioned their unholy lust.

Excusatory of continuance of life of shame as Anderson's mistress for thirteen years at one hundred dollars monthly when, undoubtedly, she was convinced during most of that period of years that Anderson would not divorce his wife to marry his paramour, she says "I had to live." That is not a valid justification of her conduct any more than Benedict Arnold's excuse for attempting to betray his country. He, too, thought he "had to live"; socially ambitious and financially embarrassed, he accepted a bribe, thereby selling his soul, not his country. Judas Iscariot thought he "had to live," so he deserted for a monetary consideration what he thought was a lost cause.

There is no legal or moral warrant for affirmance of the judgment, which should be reversed and the cause remanded with direction to the trial court to dismiss the action except as to the note representing legacy from her deceased father's estate which respondent loaned to Anderson.

MALLERY, J., concurs with MILLARD, J.

BEALS, J. (dissenting)—In my opinion, the authorities cited by Judge Millard are controlling in the case at bar, and I accordingly concur in his conclusion that the judgment appealed from should be reversed.